## BRULOTTE ET AL. *v.* THYS CO.

No. 20. Argued October 20, 1964.—Decided November 16, 1964.

*Edward S. Irons* argued the cause for petitioners. With him on the briefs was *Charles C. Countryman.*

*Elwood Hutcheson* argued the cause for respondent. With him on the brief was *George W. Wilkins.*

*Solicitor General Cox, Assistant Attorney General Orrick* and *Robert B. Hummel* filed a brief for the United States, as *amicus curiae,* urging reversal.

*Rufus S. Day, Jr., Robert W. Fulwider* and *Robert J. Woolsey* filed a brief for Well Surveys, Inc., as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent, owner of various patents for hop-picking, sold a machine to each of the petitioners for a flat sum[1] and issued a license for its use. Under that license there is payable a minimum royalty of $500 for each hop-picking season or $3.33⅓ per 200 pounds of dried hops harvested by the machine, whichever is greater. The licenses by their terms may not be assigned nor may the machines be removed from Yakima County.

---

[1] One petitioner paid $3,125 for "title" to a machine, the other petitioner, $3,300.

The licenses issued to petitioners listed 12 patents relating to hop-picking machines;[2] but only seven were incorporated into the machines sold to and licensed for use by petitioners. Of those seven all expired on or before 1957. But the licenses issued by respondent to them[3] continued for terms beyond that date.

Petitioners refused to make royalty payments accruing both before and after the expiration of the patents. This suit followed. One defense was misuse of the patents through extension of the license agreements beyond the expiration date of the patents. The trial court rendered judgment for respondent and the Supreme Court of Washington affirmed. 62 Wash. 2d 284, 382 P. 2d 271. The case is here on a writ of certiorari. 376 U. S. 905.

We conclude that the judgment below must be reversed insofar as it allows royalties to be collected which accrued after the last of the patents incorporated into the machines had expired.

The Constitution by Art. I, § 8 authorizes Congress to secure "for limited times" to inventors "the exclusive right" to their discoveries. Congress exercised that power by 35 U. S. C. § 154 which provides in part as follows:

> "Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, of the right to exclude others from making, using, or selling the invention throughout the United States, referring to the specification for the particulars thereof. . . ."

---

[2] All but one of the 12 expired prior to the expiration of the license agreements. The exception was a patent whose mechanism was not incorporated in these machines.

[3] Petitioners purchased their machines from prior purchasers under transfer agreements to which respondent was a party.

The right to make, the right to sell, and the right to use "may be granted or conferred separately by the patentee." *Adams* v. *Burke,* 17 Wall. 453, 456. But these rights become public property once the 17-year period expires. See *Singer Mfg. Co.* v. *June Mfg. Co.,* 163 U. S. 169, 185; *Kellogg Co.* v. *National Biscuit Co.,* 305 U. S. 111, 118. As stated by Chief Justice Stone, speaking for the Court in *Scott Paper Co.* v. *Marcalus Co.,* 326 U. S. 249, 256:

> ". . . any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws."

The Supreme Court of Washington held that in the present case the period during which royalties were required was only "a reasonable amount of time over which to spread the payments for the use of the patent." 62 Wash. 2d, at 291, 382 P. 2d, at 275. But there is intrinsic evidence that the agreements were not designed with that limited view. As we have seen,[4] the purchase price in each case was a flat sum, the annual payments not being part of the purchase price but royalties for use of the machine during that year. The royalty payments due for the post-expiration period are by their terms for use during that period, and are not deferred payments for use during the pre-expiration period. Nor is the case like the hypothetical ones put to us where non-patented articles are marketed at prices based on use. The machines in issue here were patented articles and the royalties exacted were the same for the post-expiration period as they were for the period of the patent. That is peculiarly significant in this case in view of other provisions

---

[4] Note 1, *supra.*

of the license agreements. The license agreements prevent assignment of the machines or their removal from Yakima County *after,* as well as before, the expiration of the patents.

Those restrictions are apt and pertinent to protection of the patent monopoly; and their applicability to the post-expiration period is a telltale sign that the licensor was using the licenses to project its monopoly beyond the patent period. They forcefully negate the suggestion that we have here a bare arrangement for a sale or a lease at an undetermined price, based on use. The sale or lease of *unpatented* machines on long-term payments based on a deferred purchase price or on use would present wholly different considerations. Those arrangements seldom rise to the level of a federal question. But patents are in the federal domain; and "whatever the legal device employed" (*Scott Paper Co.* v. *Marcalus Co., supra,* at 256) a projection of the patent monopoly after the patent expires is not enforceable. The present licenses draw no line between the term of the patent and the post-expiration period. The same provisions as respects both use and royalties are applicable to each. The contracts are, therefore, on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired as they do for the monopoly period. We are, therefore, unable to conjecture what the bargaining position of the parties might have been and what resultant arrangement might have emerged had the provision for post-expiration royalties been divorced from the patent and nowise subject to its leverage.

In light of those considerations, we conclude that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se.* If that device were available to patentees, the free market visualized for the post-expiration period

would be subject to monopoly influences that have no proper place there.

*Automatic Radio Co.* v. *Hazeltine,* 339 U. S. 827, is not in point. While some of the patents under that license apparently had expired, the royalties claimed were not for a period when all of them had expired.[5] That license covered several hundred patents and the royalty was based on the licensee's sales, even when no patents were used. The Court held that the computation of royalty payments by that formula was a convenient and reasonable device. We decline the invitation to extend it so as to project the patent monopoly beyond the 17-year period.

A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly. But to use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by tieing the sale or use of the patented article to the purchase or use of unpatented ones. See *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436; *Mercoid Corp.* v. *Mid-Continent Inv. Co.,* 320 U. S. 661, 664–665, and cases cited. The exaction of royalties for use of a machine after the patent has expired is an assertion of monopoly power in the post-expiration period when, as we have seen, the patent has entered the public domain. We share the views of the Court of Appeals in *Ar-Tik Systems, Inc.* v. *Dairy Queen, Inc.,* 302 F. 2d 496, 510, that after expiration of the last

---

[5] The petition for certiorari did not in the questions presented raise the question of the effect of the expiration of any of the patents on the royalty agreement. Also, the Hazeltine license, which covered many patents, exacted royalties for patents never used. But that aspect of the case is likewise not apposite here for the present licensees are farmers using the machines, not manufacturers buying the right to incorporate patents into their manufactured products.

of the patents incorporated in the machines "the grant of patent monopoly was spent" and that an attempt to project it into another term by continuation of the licensing agreement is unenforceable.

*Reversed.*

MR. JUSTICE HARLAN, dissenting.

The Court holds that the Thys Company unlawfully misused its patent monopoly by contracting with purchasers of its patented machines for royalty payments based on use beyond the patent term. I think that more discriminating analysis than the Court has seen fit to give this case produces a different result.

The patent laws prohibit post-expiration restrictions on the use of patented ideas; they have no bearing on use restrictions upon nonpatented, tangible machines. We have before us a mixed case involving the sale of a tangible machine which incorporates an intangible, patented idea. My effort in what follows is to separate out these two notions, to show that there is no substantial restriction on the use of the Thys *idea*, and to demonstrate that what slight restriction there may be is less objectionable than other post-expiration use restrictions which are clearly acceptable.

I.

It surely cannot be questioned that Thys could have lawfully set a fixed price for its machine and extended credit terms beyond the patent period. It is equally unquestionable, I take it, that if Thys had had no patent or if its patent had expired, it could have sold its machines at a flexible, undetermined price based on use; for example, a phonograph record manufacturer could sell a recording of a song in the public domain to a jukebox owner for an undetermined consideration based on the number of times the record was played.

Conversely it should be equally clear that if Thys licensed another manufacturer to produce hop-picking machines incorporating any of the Thys patents, royalties could not be exacted beyond the patent term. Such royalties would restrict the manufacturer's exploitation of the *idea* after it falls into the public domain, and no such restriction should be valid. To give another example unconnected with a tangible machine, a song writer could charge a royalty every time his song—his idea—was sung for profit during the period of copyright. But once the song falls into the public domain each and every member of the public should be free to sing it.

In fact Thys sells both a machine and the use of an idea. The company should be free to restrict the use of its machine, as in the first two examples given above. It may not restrict the use of its patented idea once it has fallen into the public domain. Whether it has done so must be the point of inquiry.

Consider the situation as of the day the patent monopoly ends. Any manufacturer is completely free to produce Thys-type hop-pickers. The farmer who has previously purchased a Thys machine is free to buy and use any other kind of machine whether or not it incorporates the Thys idea, or make one himself if he is able. Of course, he is not entitled as against Thys to the *free* use of any Thys machine. The Court's opinion must therefore ultimately rest on the proposition that the purchasing farmer is restricted in using his particular machine, embodying as it does an application of the patented idea, by the fact that royalties are tied directly to use.

To test this proposition I again put a hypothetical. Assume that a Thys contract called for neither an initial flat-sum payment nor any annual minimum royalties; Thys' sole recompense for giving up ownership of its

machine was a royalty payment extending beyond the patent term based on use, without any requirement either to use the machine or not to use a competitor's. A moment's thought reveals that, despite the clear restriction on use both before and after the expiration of the patent term, the arrangement would involve no misuse of patent leverage.[1] Unless the Court's opinion rests on technicalities of contract draftsmanship and not on the economic substance of the transaction, the distinction between the hypothetical and the actual case lies only in the cumulative investment consisting of the initial and minimum payments independent of use, which the purchaser obligated himself to make to Thys. I fail to see why this distinguishing feature should be critical. If anything the investment will encourage the purchaser to use his machine in order to amortize the machine's fixed cost over as large a production base as possible. Yet the gravamen of the majority opinion is restriction, not encouragement, of use.

## II.

The essence of the majority opinion may lie in some notion that "patent leverage" being used by Thys to exact use payments extending beyond the patent term somehow allows Thys to extract more onerous payments from the farmers than would otherwise be obtainable. If this be the case, the Court must in some way distinguish long-term use payments from long-term installment payments of a flat-sum purchase price. For the danger which it seems to fear would appear to inhere equally in both, and as I read the Court's opinion, the latter type of arrangement is lawful despite the fact that failure to pay an

---

[1] Installment of a patented, coin-operated washing machine in the basement of an apartment building without charge except that the landlord and his tenants must deposit 25 cents for every use, should not constitute patent misuse.

installment under a conditional sales contract would permit the seller to recapture the machine, thus terminating—not merely restricting—the farmer's use of it.   Furthermore, since the judgments against petitioners were based almost entirely on defaults in paying the $500 minimums and not on failures to pay for above-minimum use,[2] any such distinction of extended use payments and extended installments, even if accepted, would not justify eradicating all petitioners' obligations beyond the patent term, but only those based on use above the stated minimums; for the minimums by themselves, being payable whether or not a machine has been used, are precisely identical in substantive economic effect to flat installments.

In fact a distinction should not be accepted based on the assumption that Thys, which exploits its patents by selling its patented machines rather than licensing others to manufacture them, can use its patent leverage to exact more onerous payments from farmers by gearing price to use instead of charging a flat sum.   Four possible situations must be considered.   The purchasing farmer could overestimate, exactly estimate, underestimate, or have no firm estimate of his use requirements for a Thys machine.   If he overestimates or exactly estimates, the farmer will be fully aware of what the machine will cost him in the long run, and it is unrealistic to suppose that in such circumstances he would be willing to pay more to have the machine on use than on straight terms.   If the farmer underestimates, the thought may be that Thys will take advantage of him; but surely the farmer is in a better position than Thys or anyone else to estimate his own requirements and is hardly in need of the Court's protection in this respect.   If the farmer has no fixed estimate

---

[2] Petitioner Charvet was indebted to Thys only to the extent of the minimums; petitioner Brulotte was in default approximately $4,500 of which $3,120 was attributable to minimums.

of his use requirements he may have good business reasons entirely unconnected with "patent leverage" for wanting payments tied to use, and may indeed be willing to pay more in the long run to obtain such an arrangement. One final example should illustrate my point:

At the time when the Thys patent term still has a few years to run, a farmer who has been picking his hops by hand comes into the Thys retail outlet to inquire about the mechanical pickers. The salesman concludes his description of the advantages of the Thys machine with the price tag—$20,000. Value to the farmer depends completely on the use he will derive from the machine; he is willing to obligate himself on long credit terms to pay $10,000, but unless the machine can substantially outpick his old hand-picking methods, it is worth no more to him. He therefore offers to pay $2,000 down, $400 annually for 20 years, and an additional payment during the contract term for any production he can derive from the machine over and above the minimum amount he could pick by hand. Thys accepts, and by doing so, according to the majority, commits a *per se* misuse of its patent. I cannot believe that this is good law.[3]

### III.

The possibility remains that the Court is basing its decision on the technical framing of the contract and would have treated the case differently if title had been

---

[3] The Court also adverts to the provisions in the license agreements prohibiting "assignment of the machines or their removal from Yakima County" (*ante*, p. 32) during the terms of the agreements. Such provisions, however, are surely appropriate to secure performance of what are in effect conditional sales agreements and they do not advance the argument for patent misuse.

Furthermore, it should not be overlooked that we are dealing here with a patent, not an antitrust, case, there being no basis in the record for concluding that Thys' arrangements with its licensees were such as to run afoul of the antitrust laws.

declared to pass at the termination instead of the outset of the contract term, or if the use payments had been verbally disassociated from the patent licenses and described as a convenient means of spreading out payments for the machine. If indeed the impact of the opinion is that Thys must redraft its contracts to achieve the same economic results, the decision is not only wrong, but conspicuously ineffectual.

I would affirm.