**PHILLIPS SCREW COMPANY, Plaintiff,**

v.

**AMTEL, INC., Defendant.**

Civ. A. No. 74–4523–S.

United States District Court,
D. Massachusetts.

Sept. 19, 1978.

Arthur Z. Bookstein, and Edward F. Perlman, Wolf, Greenfield & Sacks, P. C., Boston, Mass., for plaintiff.

Caliste J. Alster, Richard R. Trexler and Todd S. Parkhurst, Olson, Trexler, Wolters, Bushnell & Fosse Ltd., Chicago, Ill., George M. Moriarty and Ropes & Gray, Boston, Mass., for defendant.

## FINDINGS, RULINGS AND ORDER FOR JUDGMENT

. SKINNER, District Judge.

In this action, plaintiff seeks a declaratory judgment that it is not liable for further royalty payments under a patent license agreement and recovery of alleged overpayments made under a mistake .of law. Defendant has counterclaimed for unpaid patent royalties and for an accounting of alleged trademark royalties which it claims are due under the same agreement.

### FINDINGS OF FACT

Plaintiff is engaged in research and design of metal fastenings. It does not manufacture, but licenses its inventions to manufacturers. Its principal achievement has been in the development of cross-recessed head screws and drivers, of which the "Phillips head" screw is the most familiar.

The defendant is the successor to Continental Screw Company ("Continental") and the assignee of the rights of Research Engineering & Manufacturing, Inc. ("Research") in the patent license agreement which is the subject of the action. Research was a wholly owned subsidiary of Continental, and is now a wholly owned subsidiary of the defendant. It was in fact merely the research engineering division of Continental, and its work was done by employees of Continental. It was separately incorporated for the sole purpose of licensing inventions developed and patented by Continental and its employees.

In the late 1950's, there arose a demand for a recessed head screw that could be driven with a high torque without causing the driver to slide out of the recess ("camout"). The principal companies involved in research and development were the plaintiff, Continental and American Screw Company. They determined to pool their resources and develop a single design which would be developed by the plaintiff and licensed to all manufacturers. In accordance with this plan, American Screw Company assigned its five "Muenchinger" patents to plaintiff and Research on behalf of Continental and licensed plaintiff to use its "Phipard" patents.* Other related patents were acquired from the Parker-Kalon Division of General American Transportation Corporation. Thereafter the plaintiff developed the POZIDRIV line of screws and drivers, and issued licenses under the Muenchinger and Phipard patents to various manufacturers to manufacture the POZI-

* Nos. 2,646,829, 2,601,453 and 2,592,462.

DRIV screw and also license the use of the trademark POZIDRIV.

The Muenchinger and Phipard patents dealt with the shape of the recess. The essential character of the POZIDRIV recess was the combination of a vertical driving wall of the recess with a slanted opposing wall, to permit the driver to be reversed out of the recess easily.

The agreement licensing plaintiff to use the Phipard patents was dated May 13, 1960, and is the agreement at issue in this action (hereinafter referred to as the Agreement). While the POZIDRIV design was based primarily on the Muenchinger patents, plaintiff deemed it necessary to acquire rights to the Phipard patents because the POZIDRIV design was a possible infringement of them.

The Agreement provided for the payment to Research of 12½% of the royalties on all domestic licenses of the POZIDRIV design and 12% of all royalties, domestic and foreign, arising from licensing of the trademark POZIDRIV. The Agreement by its terms expired at "the later of: the expiration of the license granted to PHILLIPS . . . ; or the expiration of the last expiring license granted by PHILLIPS relating to POZ–I–DRIV screws and drivers or containing a sublicense or an immunity from suit under the license granted hereby; or the expiration of any license granted by PHILLIPS for use of the trademark 'POZ–I–DRIV' or some other mark adopted by PHILLIPS in lieu thereof."

The last of the Phipard patents licensed to Phillips expired on July 28, 1970. Plaintiff asserts, however, and the defendant has not denied, that the only significant patent actually used in the POZIDRIV development was No. 2,592,462, for a recessed head fastener. This patent expired April 7, 1969.

The plaintiff continued paying royalties until March 7, 1973. The payment on that date was for the last quarter of 1972. The amount paid between April 7, 1969 and March 7, 1973 was $78,226.26.

Thereafter plaintiff has not paid any further royalties to the defendant under the May 13, 1960 agreement on the advice of its counsel that the Supreme Court's ruling in *Brulotte v. Thys Co.*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), invalidated so much of the contract as extended the period of payment beyond the effective life of the patent.

After the patents were assigned, plaintiff established the POZIDRIV Engineering Program. This was intended as a cooperative venture among plaintiff and the potential licensees of POZIDRIV screws to work out the engineering necessary to mass-produce the particular recess shape without distortion of the screw ("fall away"), and also, and probably primarily, to establish a uniform set of engineering standards for the POZIDRIV screws and drivers. At least six concerns, including Continental and the plaintiff, participated in this engineering program. The bulk of the engineering work was done by plaintiff's engineers and Continental's engineers. Continental's engineers spent about 300 hours on the project.

I find that this was a voluntary effort on the part of Continental and the other screw manufacturers in their own self-interest. The work done by Continental was not consideration for the payments called for by the contract of May 13, 1960. On one occasion, Mr. Phipard, Continental's chief engineer, considered that Continental was doing more than its share of the work and billed plaintiff $470 for engineering services. (The bill was nominally that of Research, but the engineers were on the payroll of Continental.) On another occasion, Continental offered to do further work on the project at an hourly rate of $12.00.

In January of 1960, Phipard invented a design for cross-recessed screws which involved a punch for the head, which, as it made the recess also impressed four crescent "dimples" opposite and outside the interior corners of the recess. The effect of this was to create pressure inward on the wall of the recess at the same time as the punch was exerting radial pressure as it created the recess. The purpose was to reduce "fall away", or radial distortion of

the outer wall of the recess resulting from the manufacturing process. Its potential use was not specific to the POZIDRIV fasteners, but was equally applicable to all cross-recessed head screws. The patents involved in the POZIDRIV program were concerned with the configuration of the recess. Reduction of "fall away" was a factor in the design, but was accomplished by the shape of the recess, specifically little valleys between the arms of the cross, creating a star pattern in the screw head.

In any case, Phipard applied for a patent on behalf of Research, which was issued October 6, 1964, and expires October 6, 1981, No. 3,151,519 ("the '519 patent"). Although the invention was conceived prior to the May 13, 1960 Agreement, it was not referred to therein. Sample screws were made in 1964, and shown to plaintiff's engineers, and Research offered to assign its patent. Plaintiff rejected the design as impractical. It has never been used in commercial production by plaintiff, Continental or anyone else. On August 8, 1967, Mr. Hunt Wardwell President of Continental Screw Company, the parent of Research, wrote to a Mr. Bouldstridge of G.K.N. Screws and Fasteners, Ltd., of Smethwick, England as follows:

> Neither this [British] application nor the issued U. S. patent which corresponds to it [the '519 patent] is a part of our Pozidriv agreement with Phillips International.

I find that, insofar as it is a question of fact, that the '519 patent is not an improvement, variation or modification in the Phipard patents licensed by Research under the Agreement.

Plaintiff has license agreements with G.K.N. Screws and Fasteners, Ltd., and its related concern, Guest, Keen & Nettlefold, Ltd., British screw manufacturers, under which it issues patent licenses for the production of POZIDRIV screws and drivers and also licenses the trademark POZIDRIV. It has received royalties since 1962 under these agreements. Defendant contends that these royalties were for the trademarks, and that they are entitled to 12½%

thereof. Plaintiff contends that these are patent royalties which are excluded from the May 13, 1960 Agreement because they are from foreign manufacturers (other than Canadian). I find that these payments were in fact royalties on patents, a viewpoint apparently shared by the defendant until after this litigation began.

## RULINGS OF LAW

■ 1. Paragraph 7 of the Agreement of May 13, 1960, obligated Research to turn over any information it had or acquired relative to the products covered by its patents. It was not required to conduct any research, however, and specifically the terms of the Agreement did not require or contemplate Research's or Continental's participation in the POZIDRIV Engineering Program. I rule that the Agreement was integrated and unambiguous.

■ 2. The Phipard '519 patent was not an improvement, variation or modification of the Phipard patents under Paragraph 1 of the Agreement of May 13, 1960. *American Cone & Wafer Co. v. Consolidated Wafer Co.*, 247 F. 335 (2d Cir. 1917). *Deering Milliken Research Corp. v. Leesona Corp.*, 315 F.2d 475 (2d Cir. 1963). It was apparently not so considered by defendant until the commencement of this action. Even if it were, it seems doubtful that defendant could extend its right to royalties by generating modifications which were not accepted or used by plaintiff.

■ 3. The Agreement of May 13, 1960 was a discreet, integrated and unambiguous document. It cannot be read to be more than its terms purport, namely, an agreement for the payment of royalties in return for the license of certain patents. I reject the defendant's claim that it was in fact part of a joint enterprise, in which the royalties represent defendant's share of the profits. That is not what the contract says. If there was a joint enterprise, it was in the production of a superior screw, in the manufacture and sale of which Continental (and hence Research) was to reap its reward. Accordingly, *Brulotte v. Thys Co.*, 379 U.S.

29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), applies to this case. So much of the contract as requires the payment of royalties after the expiration of the patents is "illegal *per se* " and is "unenforceable," and the plaintiff is entitled to a declaratory judgment to that effect.

4. The plaintiff seeks to recover payments made after the expiration of the patents. This raises a more perplexing question. The parties agree that this is a question of Massachusetts law. Since Massachusetts recognizes the effect of federal policy on the resolution of such a question, the question of the paramountcy of federal patent law does not arise. *Council v. Cohen*, 303 Mass. 348, 21 N.E.2d 967 (1939). *Brulotte v. Thys Co., supra*, offers ambiguous language on the point. Referring to the provision extending payments as "illegal *per se* " suggests one result in favor of the plaintiff while the reference to the provision as "unenforceable" rather than "void" suggests the opposite.

 The general rule in Massachusetts is that payment under a mistake of law may not be recovered. *Hinckley v. Barnstable*, 311 Mass. 600, 42 N.E.2d 581 (1942). If, however, the recipient has offended public policy by overreaching in some way, the "less guilty party" is allowed to recover. *Council v. Cohen*, 303 Mass. 348, 354, 21 N.E.2d 967 (1939). The Agreement in question was made before the decision in *Brulotte v. Thys Co., supra*, but after the decision in *Automatic Radio Co. v. Hazeltine*, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). The defendant could not be held to have anticipated *Brulotte* in 1960. Despite the public policy references in *Brulotte*, this is basically a case where the plaintiff slept on its rights. It is a close case, but I am of the opinion that the rule of *Hinckley* should prevail, and the plaintiff is not entitled to recover. It is therefore unnecessary to decide whether the proper cutoff date is April 7, 1969, as contended by plaintiff, or July 28, 1970, the expiration of the last Phipard patent licensed. *Cf. Automatic Radio Co. v. Hazeltine, supra*.