RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KEVIN T. LAVERY,

*Plaintiff-Appellant*,

No. 24-1329

*v.*

PURSUANT HEALTH, INC.,

*Defendant-Appellee*.

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:22-cv-10613—Jonathan J.C. Grey, District Judge.

Argued: December 12, 2024

Decided and Filed: January 24, 2025

Before: SUTTON, Chief Judge; MURPHY and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Bradley L. Smith, ENDURANCE LAW GROUP PLC, Jackson, Michigan, for Appellant. Adam H. Charnes, KILPATRICK TOWNSEND & STOCKTON LLP, Dallas, Texas, for Appellee. **ON BRIEF:** Bradley L. Smith, ENDURANCE LAW GROUP PLC, Jackson, Michigan, for Appellant. Adam H. Charnes, KILPATRICK TOWNSEND & STOCKTON LLP, Dallas, Texas, Joel D. Bush, II, Bennett T. Richardson, KILPATRICK TOWNSEND & STOCKTON LLP, Atlanta, Georgia, for Appellee.

─────────────────

## OPINION

─────────────────

SUTTON, Chief Judge. Kevin Lavery invented a vision screening device and contracted with Pursuant Health, a company that makes vision screening kiosks, to sell it. He transferred

his patent to the company in exchange for royalties on its kiosk sales. When Lavery's patent expired and Pursuant Health stopped paying him, he sued. The district court ruled that the expiration of his patent made the royalty unenforceable and granted summary judgment to Pursuant Health. We affirm.

I.

Kevin Lavery, M.D., ophthalmologist, added inventor to his name in 2001. He created an "automatic medical test apparatus" that could perform vision tests on patients and transmit the results to offsite doctors. R.30-5 at 2. He obtained a patent for the device.

Meanwhile, Bart Foster had been working with his employer, a Novartis subsidiary, to develop EyeSite, a kiosk that would allow people to test their vision at Walmart and other big-box stores around the country. In 2004, Foster applied for, and eventually received, a patent for his kiosk concept and sought to create a new company to pursue the project. Because his employer (Novartis) owned the rights to his patent application, Foster looked for a way to encourage Novartis to transfer the pending patent rights to him and his venture.

Enter Lavery and his patented device. Novartis's attorney told Foster about Lavery's patent after conducting due diligence on its kiosk plans. Foster hoped that, if he could acquire the rights to Lavery's issued patent, Novartis would agree to transfer to him the rights to his own pending patent.

Foster was right. Foster and Lavery signed a letter of intent in June 2007 indicating that they had reached an agreement for Lavery to transfer his patent to a new company that Foster intended to form. Novartis eventually sold Foster the patent rights to the kiosk, and Foster set up his venture, eventually called Pursuant Health, on October 1, 2007. That prompted Foster and his venture to finalize an agreement with Lavery.

On October 11, 2007, Lavery formally agreed to transfer his patent rights to Pursuant Health. Lavery signed three agreements in total: (1) a Letter of Intent with Pursuant Health that memorialized the terms of their exchange, including transfer of stock in Pursuant Health to Lavery; (2) a Contribution Agreement that gave Pursuant Health rights to his "Intellectual

Property" in exchange for a 1% cut on domestic sales of its "vision screening kiosks and any derivative or complementary applications," to be bumped to 3% if Pursuant Health sold kiosks with retinal cameras, R.30-8 at 3 (§ 1.2(a), (e)); and (3) a Consulting Agreement that made Lavery the Chief Medical Officer of Pursuant Health and permitted him to supply services for a fee.

The arrangement apparently worked for several years. In 2008, the new company set up the first kiosk in a Walmart in Georgia. More kiosks followed. As Pursuant Health sold kiosks around the country, it paid Lavery his promised royalty. Through 2021, Lavery received around $708,000 in royalties.

Patents do not last forever, however. When Lavery's 20-year patent expired in May 2021, Pursuant Health stopped paying the royalty. Lavery filed this state-law diversity action in federal court, seeking a declaration that the 1% royalty did not have a time limit, damages for breach of the Contribution Agreement, and damages for unjust enrichment. As relevant here, Pursuant Health raised two defenses. The first was that the Contribution Agreement provided for royalties only during the 20-year lifespan of Lavery's patent under the defined "Term" of the Agreement. The second was that, even if the Agreement provided for royalties after the patent's expiration, the patent's expiration rendered the royalty agreement void and unenforceable. Pursuant Health moved for summary judgment on the second ground. The district court granted Pursuant Health's motion. Lavery appeals, challenging only the grant of summary judgment on his claim that Pursuant Health breached the Contribution Agreement.

II.

Congress has made jurisdiction over patent disputes doubly exclusive. It permits them to be heard only at the outset in federal district court, not state court. "[D]istrict courts," Congress has directed, "shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents," and "[n]o State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents." 28 U.S.C. § 1338(a). Congress permits appeals from those district court decisions only to the Federal Circuit. Even though we ordinarily may review a district court's final order granting summary judgment in a diversity

action, *see id.* §§ 1291, 1332, that is not true of appeals in "any civil action arising under . . . any Act of Congress relating to patents" or an action involving a "compulsory counterclaim arising under" the same, *id.* § 1295(a)(1). In such cases, appellate jurisdiction lies exclusively with the Federal Circuit. *Id.*

In this instance, Pursuant Health does not raise any counterclaims. That leaves just one question: Does Lavery's state-law contract claim arise under federal patent law? *See id.* Two possibilities for arising-under jurisdiction exist. The most obvious occurs when patent law creates the plaintiff's cause of action. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808–09 (1988). The other possibility occurs when state law creates the cause of action but the claim, as pleaded by the plaintiff, turns on a disputed and substantial patent issue. *Id.* at 809; *see Gunn v. Minton*, 568 U.S. 251, 258 (2013).

Lavery's contract claim does not arise under federal patent law. The claim turns on state law and requires the courts to decide only whether the relevant contracts create a royalty that extends beyond the 20-year expiration date. *See Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 470 (Del. Ch. 2024). Although the contract claim concerns the business value of a patent, it does not turn on its validity, infringement of it, or any other patent-law-centric dispute. *See Lab'y Corp. of Am. Holdings v. Metabolite Lab'ys, Inc.*, 599 F.3d 1277, 1284 (Fed. Cir. 2010); *see also Cardiovascular Sys., Inc. v. Cardio Flow, Inc.*, 37 F.4th 1357, 1362 n.2 (8th Cir. 2022). The same is true for Lavery's unjust enrichment claim. It asks only whether a contract controls the parties' relationship and, if not, whether Pursuant Health unjustly retained benefits owed to Lavery. *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009). Because Lavery's claims involve state law from start to finish and because they do not turn on the meaning of patent law, they do not arise under patent law.

Pursuant Health's invocation of the 20-year patent bar raises an affirmative defense that does not eliminate our jurisdiction. While Congress vests exclusive jurisdiction in the Federal Circuit over cases with compulsory patent counterclaims, 28 U.S.C. § 1295(a)(1), it has not done the same for affirmative defenses, *see* Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 19(b), 125 Stat. 284, 331–32 (2011). We cannot lightly assume that Congress "silently abrogated," *Kelly v. Robinson*, 479 U.S. 36, 47 (1986), the century-old rule that defenses do not

generate "arising under" jurisdiction, *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152–53 (1908); *see also Wesley Corp. v. Zoom T.V. Prods.*, 749 F. App'x 449, 450 (6th Cir. 2019) (order).  The Ninth and Federal Circuits agree that 28 U.S.C. § 1295(a) applies only to patent counterclaims, not affirmative defenses.  *C.R. Bard, Inc. v. Atrium Med. Corp.*, 112 F.4th 1182, 1188 n.3 (9th Cir. 2024) (per curiam); *Xitronix Corp. v. KLA-Tencor Corp.*, 882 F.3d 1075, 1076 (Fed. Cir. 2018).  No circuit has ruled to the contrary to our knowledge.

That leaves Lavery, the claimant, largely in charge of whether to invite or "avoid . . . jurisdiction" in this case.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913).  Lavery chose to bring state law claims, neither of which turns on patent law.

The two key Supreme Court cases at issue in this case reinforce our conclusion that we have jurisdiction over this dispute.  *Brulotte v. Thys Co.* involved an appeal from the Washington Supreme Court, not from a federal court.  379 U.S. 29, 30 (1964).  By 1964, Congress's prohibition on state courts handling patent disputes had been in place for around 90 years.  Title XIII, Rev. Stat. § 711 (1874); *see also* Pub. L. No. 80-773, § 1338, 62 Stat. 869, 931 (1948).  And *Kimble v. Marvel Entertainment, LLC*, involved an appeal from the Ninth Circuit, not from the Federal Circuit.  576 U.S. 446, 450–51 (2015).  By 2015, Congress's vesting of exclusive jurisdiction over patent appeals in the Federal Circuit had been in place for 33 years.  Pub. L. No. 97-164, § 127(a), 96 Stat. 25, 37 (1982).  Neither party to today's case disputes this conclusion.  We have jurisdiction over this appeal.

III.

At stake on the merits is whether the 20-year limit on this patent rendered the parties' royalty provision unenforceable in 2021.  As the proponent of this defense, Pursuant Health bears the burden of proving it.  *See Taylor v. Sturgell*, 553 U.S. 880, 907 (2008).  We give fresh review to the district court's summary judgment decision and draw all reasonable factual inferences in Lavery's favor.  *See Peffer v. Stephens*, 880 F.3d 256, 260, 262 (6th Cir. 2018).

A.

Patents give their holders certain rights over the patented invention.  They may make, use, or sell the invention and exclude others from doing the same.  And they may sell or license those rights for royalty payments.  At the same time that the Constitution and Congress create these rights, they also limit them.  The Constitution empowers Congress to grant inventors exclusivity only for a "limited Time[]," U.S. Const. art. I, § 8, cl. 8, which Congress currently sets at 20 years, 35 U.S.C. § 154(a)(2).  When that time runs out, the patent expires, and the public may freely use the invention.  Any attempt by the inventor to extend his monopoly after the limited term of exclusivity "runs counter to the policy and purposes of the patent laws." *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945).

*Brulotte* and *Kimble* illustrate how this principle works.  In *Brulotte*, an inventor licensed his patented hop-picking machine to farmers in exchange for "a minimum royalty of $500 for each hop-picking season or $3.33 1/3 per 200 pounds of dried hops harvested by the machine, whichever is greater."  379 U.S. at 29.  The machine incorporated seven of the inventor's patents, all of which expired before the licenses. *Id.* at 30.  When the farmers refused to pay the required royalties, the inventor sued. *Id.*  The Court declined to enforce the royalty provision after the patents expired. *Id.*  By requiring the same payment "for use during [the post-expiration] period," the Court explained, the inventor impermissibly "project[ed] [his] monopoly beyond the patent period." *Id.* at 31–32, 34.  That, the Court held, was "unlawful per se." *Id.* at 32.

In *Kimble*, the Court rejected an effort to overrule *Brulotte* and clarified how the underlying principle works in practice.  As to the limit on royalties, *Kimble* explained, a "court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent.  If not, no problem; if so, no dice."  576 U.S. at 459.  In applying this rule, *Kimble* offered several legitimate ways in which contracting parties retain flexibility to arrange their post-expiration affairs. *Id*. at 453.  Licensees might "defer payments for pre-expiration use of a patent into the post-expiration period." *Id.*  Or they might embrace "business arrangements other than royalties," such as sales with respect to trade secrets or other non-patent property. *Id.* at 454.  If inventors contributed non-patent rights, they could ask for, say, "a 5% royalty during the patent

period (as compensation for the two combined) and a 4% royalty afterward (as payment for the trade secret alone)." *Id.* And if the inventors contributed multiple patents, royalties might "run until the latest-running patent covered in the parties' agreement expires." *Id.*

B.

In applying this test, we start with the most relevant contract: the Contribution Agreement. On one side of the deal, Lavery contributed to the company "Intellectual Property" as described in Exhibit B. R.30-8 at 2 (Contribution Agreement Recital A). In full, Exhibit B refers to Lavery's "U.S. Patent No. 6,594,607 (the 'Patent')," and "All proprietary information, trade secrets, and other intellectual property rights held by Lavery and attendant to the Patent." R.30-8 at Ex. B.

On the other side of the deal, Lavery received an equity interest in the company and a royalty. Here's what the royalty provision says about Pursuant Health's obligations:

> [It] agree[d] to pay Lavery, or his assignee, a perpetual royalty (the "Royalty"), on a quarterly basis, of one percent (1%) (the "Royalty Percentage") of the Company's Net Domestic Sales of Products for the prior quarter; provided, that at the time that the Company first receives Net Domestic Sales from Retinal Camera Products, the Royalty Percentage shall be increased to three percent (3%) for the remainder of the Term[] . . . .

R.30-8 at 3 (Contribution Agreement § 1.2(a)). "Products," defined a few subsections down, are "vision screening kiosks and any derivative or complementary applications." R.30-8 at 3 (§ 1.2(e)).

A few features of this language and the arrangement between the parties stand out. The Contribution Agreement calls this a "perpetual royalty," and the parties on appeal do not identify any language in this contract or any other between the parties that contains an end date for this royalty payment. By its terms, the key contract thus extends well beyond the 20-year expiration date of Lavery's patent.

At the same time, the relevant contracts do not specifically identify any non-patent contributions, whether trade secrets or something else, that this royalty covers. From the Letter of Intent to the Contribution Agreement, the only specific form of intellectual property that

Lavery contributed to the company at the time of the Contribution Agreement was the patent. While inventors remain free to seek compensation for non-patent rights that extend beyond a patent's expiration date, *see Kimble*, 576 U.S. at 454, they must identify them in the contract. In this instance, however, the contract does not contain any cognizable indication that the royalty covered anything other than Lavery's patent.

The royalty base confirms this conclusion. It turns on the number of kiosks sold, each of which incorporated Lavery's patent. The patent sets Lavery's invention in broad terms. It "is an apparatus and method for conducting a medical screening test on a user patient," R.30-5 at 5, including retinal, glucose, blood pressure, and pulmonary tests. The patent covers twelve different types of claims concerning the "medical screening apparatus," which the patent provides can be housed in a "kiosk," run "fully automated test[s]" when prompted by patients, and "transmit[] the test" for offsite analysis. R.30-5 at 5–7. And it covers six different claims concerning methods "for executing a medical test on a user patient" with the apparatus. R.30-5 at 7. By making clear that the coin of the realm was a vision screening kiosk, by calculating the royalty based on the number of kiosks sold, by providing for the sale of kiosks that all incorporated the patent, and by permitting the royalty to extend beyond the patent's expiration date, the contract improperly sought post-expiration royalties.

The royalty's tiered structure points in the same direction. The 1% and 3% royalty rates both turn on patented rights. The contract sets the lower royalty rate as the default and jumps to 3% if Pursuant Health equips its kiosks with retinal cameras, one of the many features of Lavery's patent. Because both royalties turn on sales of kiosks that use the patent, they do not fall within the exception for offering a second rate for non-patented intellectual property—say a lower rate after the patent expires. *Kimble*, 576 U.S. at 454.

By every measure that counts, Pursuant Health and Lavery agreed to a 1% and 3% royalty for use of Lavery's patent. Now that Lavery's patent has ended, he may no longer receive either cut.

Lavery resists this conclusion from multiple directions. He claims that the 1% royalty survives because it amounts to deferred compensation or is part of a joint venture. The first

problem with these contentions is that Lavery did not raise them below.  The second problem is that there is no evidence in the three agreements that supports this claim.  In particular, the Contribution Agreement says nothing about the royalty amounting to a form of deferred compensation or serving the interests of a joint venture.  And, notably, it conveys all of the intellectual property that prompted the contract.  To repeat, it says:  "U.S. Patent No. 6,594,607 (the '<u>Patent</u>')" and "All proprietary information, trade secrets, and other intellectual property rights held by Lavery and attendant to the Patent."  R.30-8 at Ex. B.  While *Kimble* leaves inventors with plenty of options to defer compensation or to compensate an inventor for non-patent property, it does not permit courts to re-write a contract to create a form of compensation not identified in it.

Lavery points out that the Contribution Agreement covers "trade secrets" as well as the patent.  In the abstract and in the context of a different contract, that might well be a powerful argument.  *See Kimble*, 576 U.S. at 454 ("[P]ost-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent.").  But Lavery does not identify any trade secret in the relevant contracts separate from the patented intellectual property, thereby depriving this argument of any traction.

Lavery turns to three cases from our sister circuits for support.  But none of them advances his claim.  One of them, *Zimmer Biomet Holdings, Inc. v. Insall*, concerned an arbitration award that upheld post-expiration compensation.  108 F.4th 512, 519–20 (7th Cir. 2024).  But as the Seventh Circuit correctly observed, it had "no power to unwind" the arbitration panel's decision because it turned on "a question of interpretation" of the contract "reserved for the arbitrators."  *Id.*

*C.R. Bard, Inc. v. Atrium Medical Corp.* does not advance Lavery's position either.  112 F.4th 1182 (9th Cir. 2024).  It involved a contract that "unambiguously" provided for royalties on sales of patented products only until the patent expired.  *Id.* at 1192.  The Ninth Circuit thus had no occasion to explain what should happen to Pursuant Health's distinct contract.

A similar conclusion applies to *Ares Trading S.A. v. Dyax Corp.* 114 F.4th 123 (3d Cir. 2024). In upholding that royalty, the Third Circuit reasoned that the royalty was "not calculated based on activity requiring postexpiration use of" the patents. *Id.* at 143. The contract in that case confirmed, and the licensee conceded, that "the definition of what products the royalty is owed on does not depend in any way on using" the patents and that any use of the patents occurred "entirely before expiration." *Id.* (quotation omitted). The *Ares* royalty, then, did not turn on use of the patents after their expiration. That simply is not the case here. Pursuant Health promised to pay Lavery a royalty on sales of "vision screening kiosks" that both parties agree use his patent. R.30-8 at 3 (§ 1.2(e)).

Lavery contends for the first time on appeal that the "record is silent on whether the parties believed any or all of [Pursuant Health's] early kiosks or later kiosks read on ('infringed') [his] patent claims." Reply Br. 14. But our inquiry turns on the objective meaning of the contract, not on what the parties subjectively believed after they signed the papers. At all events, Lavery's positions in the district court belie the ones he professes today. He stated several times that Pursuant Health is "currently using" his patent, R.31 at 4–5, 20, and that the royalty base "relates to [his] Patent rights," R.48 at 10. Pursuant Health, too, acknowledged that the royalty base is for "products covered by or related to" Lavery's patent. R.49 at 8.

We affirm.