PITNEY-BOWES, INC., Plaintiff,

v.

Celina MESTRE, Personal Representative
of the Estate of Luis Mestre,
Deceased, Defendant.

No. 78-1097-Civ-SMA.

United States District Court,
S. D. Florida,
Miami Division.

Feb. 12, 1981.

Jerome H. Shevin, Sparber, Shevin, Rosen, Shapo & Heilbronner, P. A., Miami, Fla., for defendant.

## MEMORANDUM OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

ARONOVITZ, District Judge.

### NATURE OF ACTION

Plaintiff Pitney-Bowes commenced this declaratory relief action pursuant to 28 U.S.C. §§ 2201, 2202, seeking a construction of certain license agreements and a declaration of its rights and obligations under those agreements. The five written agreements in issue were entered into by Defendant Mestre[1] and Thomas Collators Industries, Inc., a wholly owned subsidiary of Thomas Collators, Inc. (hereinafter collectively referred to as "Thomas"), on the following dates:

(1) the Rotary Collator Agreement—October 3, 1958;

(2) the Vertical Collator Agreement—October 16, 1959;

(3) the A–10 Collator Agreement—September 1, 1962;

(4) the Auto-Sorter Agreement—December 30, 1965; and,

(5) a written Amendment to the Agreements—December 30, 1965.

Pitney-Bowes, as successor in interest to Thomas, specifically seeks a declaration:

1. That each of the four machine agreements, as amended by the 1965 Amendment, expires on the expiration date of the last to expire patent licensed under that agreement;

2. That each agreement is unenforceable after the expiration date of the last to expire patent licensed under that agreement; and

Lars I. Kulleseid, Jesse J. Jenner, Frank L. Politano, Fish & Neave, New York City, William Dunaj, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for plaintiff.

---

1. Luis Mestre, the signatory to the agreements and the original named Defendant, passed away during the pendency of these proceedings. By order dated November 24, 1980, *see* Docket No. 133, Celina Mestre was substituted, in her capacity as Personal Representative of the Estate of Luis Mestre, as party Defendant. Reference to Mestre throughout this opinion refers to Luis Mestre.

3. That Pitney-Bowes may continue to make, manufacture, use, import, export, sell and deal in the machine that is the subject of the agreement, after expiration of the agreement, without entering into a further agreement with Mestre and without paying further royalties to Mestre.

Mestre, on the other hand, seeks a declaration:

1. That the agreements in dispute are in full force and effect;

2. That the agreements licensed "trade secrets and know-how" and that Pitney-Bowes is obligated to pay royalties to Mestre for as long as it manufactures and sells machines licensed by the agreements; and

3. That an accounting be had and that Pitney-Bowes be required to make all royalty payments presently owing to Mestre.

## PROCEDURAL POSTURE

Pitney-Bowes filed this action subsequent to a demand for arbitration made by Mestre. The demand for arbitration asserted, *inter alia*, that Pitney-Bowes was obligated to make royalty payments on the sales of Mestre's licensed machines up to and including the termination date of the license agreements and that Pitney-Bowes could not thereafter manufacture or market the machines unless new agreements were executed. Along with its complaint, Pitney-Bowes also filed a motion to enjoin Mestre from proceeding further in the arbitration proceeding. That motion was granted by Order of this Court dated November 8, 1978, on the grounds that the "claims present issues too intertwined with federal [patent] law and policy to be arbitrable."

The matter is now before the Court on the parties' Cross-Motions for Summary Judgment. On November 12, 1980, the Court heard oral argument on the cross-motions. *See* Fed.R.Civ.P. 56(c). The principal issues raised by the parties have been comprehensively briefed and argued, and, in the view of the Court, those issues can be stated as follows:

1. (a) Whether the agreements in question were licenses for the exclusive use of "trade secrets and know-how" which were not conditioned on the procurement of patents; or

(b) Whether the agreements were patent licenses for the exclusive use of the licensee pursuant to the provisions and policies of federal patent law; or (c) Whether the agreements were hybrid licenses granting rights both to "trade secrets and know-how" [1a] and to claims of patents.

2. Whether the agreements, because of their nature, are subject to federal patent law, which precludes the extension of royalty obligations beyond the life of the last to expire patent licensed under the agreement.

3. Whether the agreements provide that the exclusive rights revert to the licensor at the expiration of the term of each agreement; or whether the licensee is free to manufacture and sell the machines, which were the subject of the license, without royalty obligation after the license expires.

## THE PARTIES

Mestre was a renowned inventor of paper handling equipment, including automatic collating devices. In 1954, Mestre designed and later built a prototype of a machine called the Rotary Collator. Some time in 1957, Pitney-Bowes showed an interest in the machine and recognized its potential in the automatic collator market. Pitney-Bowes decided not to seek a license for the machine at that time, apparently because production costs were too high. Additionally, Pitney-Bowes estimated that three years of development work would be necessary before the Rotary Collator could be produced for sale. Thomas Collators Industries, Inc. observed and developed an interest in the machine and in 1958, after negotiation, executed the Rotary Collator Agreement with Mestre. Within six months of this agreement, Thomas, with Mestre's assist-

[1a]. While the Court recognizes the definitional differences between "trade secrets" and "know-how", for the purposes of the instant case the distinction is of little moment; therefore, the terms may be used interchangeably in this opinion.

ance, had begun production and entered the collator market. Thomas soon became a successful participant—if not a leader—in the business of manufacturing and marketing automatic collators. By 1965, Mestre and Thomas had negotiated three (3) additional agreements covering the Vertical, A–10 and Auto-Sorter collator machines.

In 1965, Pitney-Bowes began the process of acquisition of Thomas. As a condition precedent to acquisition, Pitney-Bowes insisted that the four collator agreements be modified. The 1965 Amendment Agreement was the result.

### THE AGREEMENTS

For reasons which the discussion below will make apparent, each agreement requires and merits individualized examination. What follows is a synopsis of the pertinent provisions of the agreements which are in issue here.

1. *The Rotary Collator Agreement* (1958).

The Rotary Collator Agreement was a product of the combined efforts of representatives of both Mestre and Thomas.[2] Under the agreement Mestre granted to Thomas the right to manufacture and market the "inventions embodied in the Rotary Collator," which rights are exclusive against Mestre and his assigns.[3] The

license on the then-existing Rotary Collator was granted to Thomas without reference to and with no express condition upon the issuance of patents on the machine. At the time of the execution of the agreements, there were no patents issued on the Rotary Collator; although two patent applications were pending which subsequently were granted.[4] Under the agreement, in exchange for the license, Thomas contracted to pay Mestre royalties on each machine manufactured and sold, up to a maximum royalty payment of $975,000. The agreement did not, however, provide for a specific date of expiration.[5]

Under the Term provision (¶ 2(a)–(d)), the agreement established grounds upon which the agreement could be terminated: at the option of Thomas, in the event (1) a competent judgment determined Thomas had infringed a patent owned adversely to Mestre, or (2) Mestre breached the agreement or any warranty therein; or, at the option of Mestre, in the event (1) Thomas breached the agreement, or (2) Thomas was decreed insolvent or bankrupt.

Pursuant to the agreement, Mestre was required to supply Thomas with two prototypes, a set of shop experimental drawings and a parts list. Mestre was not required to provide tools, dies, jigs, fixtures or personal services to Thomas, but the agreement indicated that Mestre could do so at his discretion.

---

2. While Pitney-Bowes urges the importance of their contention that the first draft of the agreement was prepared by Mestre's attorney, the record reflects that the agreement in final form was the product of negotiations by counsel for Mestre and Thomas.

3. The agreement, paragraph 1, provides:
  1. *The License.* Mestre grants to Thomas the right to manufacture, have made or manufactured, use, import, export, sell and deal in the inventions embodied in the Rotary Collator within the United States of America, its territories and possessions and foreign countries all of which rights hereby granted during the term hereof shall be exclusive against Mestre and his assigns. If Mestre shall invent any improvement (but he shall not be obligated to do so), Thomas shall be entitled to be licensed thereunder for the life of the patent on such improvement, in which event the term of this agreement will be deemed

extended to the life of that patent, and Thomas shall continue to pay royalties thereon at the rate specified in paragraph 3(a), unless the parties shall otherwise agree, after completion of the payment of the maximum amount therein specified.

4. It is Mestre's position that, even though patents were issued on the Rotary Collator, the license granted more than patent protection to Thomas; e. g., included in the inventions embodied in the Rotary Collator were Mestre's trade secrets and know-how.

5. In oral argument Mestre indicated that under this arrangement, had Thomas paid the maximum royalty, all rights in the Rotary Collator would have been Thomas' with no remaining interests in Mestre. Mestre contends that the Amendment Agreement, specifically ¶ 11(b), altered the preceding scheme.

2. *The Vertical Collator Agreement* (1959).

The Vertical Collator Agreement was the product of negotiation between Mestre and Thomas and was executed before any patents were issued on the Rotary Collator. The agreement granted to Thomas the sole and exclusive license to manufacture and market the Vertical Collator specifically described in patent applications.[6] There were patent applications (on the machine) pending at the time of execution of the agreement, which applications were subsequently granted. The agreement provides for its expiration upon the death of Mestre, after seventeen years or upon the expiration of the last to expire patent, whichever is greater. The agreement lists the same four grounds for termination mentioned above. Included in the Term Article is a provision requiring Thomas and its assignees and sublicensees to keep secret all confidential information relating to the Vertical Collator.[7]

Pursuant to this agreement, Mestre was required to supply to Thomas two prototypes and a set of shop experimental drawings and a parts list. Mestre had the option, at his discretion, to supply production equipment and personal services to Thomas to assist in production initiation. Apparently, Thomas had begun production of the Vertical Collator prior to the execution of this agreement. Thomas acknowledged the disclosure of Mestre's "know-how" which had been transferred earlier.[8]

The agreement required Thomas to pay royalties to Mestre in exchange for the exclusive license.

3. *The A–10 Collator Agreement* (1962).

The A–10 Collator Agreement was executed after negotiation between representatives of Mestre and Thomas. Under the agreement Mestre granted to Thomas the sole and exclusive right and license to make and sell the A–10 Collator, parts thereof and attachments thereto, "and under any letters patent which may hereafter issue on the inventions embodied therein." [9] There were letters patent issued on the A–10 Collator subsequent to the execution of the agreement. Pursuant to the agreement Thomas contracted to pay royalties in exchange for the license.

**6.** The agreement, Article I, provides:
*The License*
Mestre hereby grants to Thomas, its successors and assigns, the sole and exclusive right and license to make, manufacture, have made or manufactured by others, use, import, export, sell and deal in the Vertical Collator specifically described in said patent applications and any and all modifications thereof and improvements thereon that Mestre may hereafter make or develop and under any letters patent which may issue thereon and, subject to the obtaining of Mestre's prior written consent, to sub-license others to do so, within the United States of America, its territories and possessions, and in foreign countries throughout the world.

**7.** The agreement at Article II, ¶ (e) provides:
(e) No manufacturer shall be employed by Thomas, its assignees or sublicensees to manufacture the Vertical Collator, or such substantial components thereof as are likely to develop knowledge of the essential elements of the manufacture thereof, unless such manufacturer shall first agree in writing to keep secret all confidential information relating to the Vertical Collator, parts thereof or attachments thereto, and shall agree in writing that all special tools, dies, jigs and equipment used in the manufacture of the Vertical Collator, parts thereof and attachments thereto shall be and remain the exclusive property of Thomas, its assigns or sublicensees as the case may be.

**8.** The second "whereas clause" of the agreement reads as follows:
WHEREAS, Thomas has begun the manufacture and development for sale of the Vertical Collator solely by virtue of Mestre's disclosure to it of the principles thereof and his transfer to it of necessary manufacturing and technical "know how" necessary for the commercial production thereof;

**9.** The agreement, Article I(a), provides:
*The License*
(a) Mestre hereby grants to Thomas the sole and exclusive right and license to make, manufacture, have made or manufactured, use, import, export, sell and deal in, within the United States of America, its territories and possessions, and in foreign countries throughout the world, the A–10 Collating Machine, parts thereof and attachments thereto, and under any letters patent which may hereafter issue on the inventions embodied therein.

The agreement, by its terms, continues in full force and effect for seventeen years or for the term of any later issued patent, whichever is greater.[10] The agreement contains four grounds for termination similar to those mentioned in the Rotary Collator Agreement, as well as a secrecy requirement similar to that in the Vertical Collator Agreement.

Mestre was obligated to provide to Thomas one prototype of the A–10, a set of shop experimental drawings and a parts list for the prototype unit. Mestre had the option, at his discretion, to provide production equipment and personal services to assist Thomas.

### 4. *The Auto-Sorter Agreement* (1965).

At about the time Mestre offered Thomas a license on the Auto-Sorter, Pitney-Bowes was negotiating the acquisition of Thomas. The Auto-Sorter Agreement was prepared during these negotiations. Under the agreement Mestre granted Thomas a license to make and sell the Auto-Sorter in terms similar to those used in the A–10 Agreement,[11] including the reference to a license "... under any letters patent which may hereafter issue...." Patents were granted subsequent to the effective date of the agreement. The agreement provides for the payment of royalties by Thomas in exchange for the license.

The Term Article of the agreement establishes the life of the license as seventeen years or the term of the last to issue patent on the Auto-Sorter, whichever is greater.[12] The four grounds for termination mentioned in the preceding agreements along with the secrecy requirement are included in this agreement.

Mestre was obligated to supply to Thomas two prototype Auto-Sorter Machines, a set of shop drawings and parts list. Mestre, at his discretion, could supply production equipment and personal services.

### 5. *The Amendment Agreement* (1965).

This agreement was negotiated by Mestre, Thomas and Pitney-Bowes, and was executed along with the Auto-Sorter Agreement. Pitney-Bowes insisted, as a condition of the acquisition of Thomas, that the four machine agreements be modified. Pitney-Bowes wanted the scope of the licenses to be limited to the claims of Mestre's patents, and prepared a draft reflective of this desire.[13] Mestre rejected this draft, insisting that royalties be paid for

---

10. The agreement, Article II(a), provides:
    *The Term*
    (a) The license hereby granted shall continue in full force and effect for seventeen (17) years, or for the term of any patent or patents which now or hereafter may issue on the A–10 Collating Machine, parts thereof and attachments thereto, owned or developed by Mestre for which Thomas has exclusive rights under this Agreement, whichever is greater.

11. The agreement, Article I(a), provides:
    *The License*
    (a) Mestre hereby grants to Thomas the sole and exclusive right and license to make, manufacture, have made or manufactured, use, import, export, sell and deal in, within the United States of America, its territories and possessions, and in foreign countries throughout the world, the Auto-Sorter Machine, parts thereof and attachments thereto, and under any letters patents, if any, which may hereafter issue on the inventions embodied therein.

12. The agreement, Article II(a), provides:
    *The Term*
    (a) The license hereby granted shall continue in full force and effect for seventeen (17) years, or for the term of any patent or patents which now or hereafter may issue on the Auto-Sorter Machine, parts thereof and attachments thereto, owned or developed by Mestre for which Thomas has exclusive rights under this Agreement, whichever is greater.

13. The Whereas Clauses of the first draft Amendment include the following:
    WHEREAS, Mestre is the sole owner of all right, title and interest in and to the Letters Patent issued by the United States Patent Office, as listed on the attached Schedule A, the Letters Patent issued by the Patent Offices of Canada, Great Britain, France, Switzerland and Belgium, as listed on the attached Schedule (sometimes collectively referred to as the Patents), Applications for Letters Patent filed in the United States Patent Office, as listed on the attached Schedule C, and Applications for Letters Patent issued by the Patent Offices of various other countries, as listed on the attached Schedule D (sometimes collectively referred to as the Patent Applications), and

know-how and trade secrets. Pitney-Bowes acquiesced in this demand. Mestre prepared a draft which was the subject of negotiation among the parties. The Amendment Agreement was the product of this negotiation.

The first Whereas clause of the Amendment refers to the Rotary Collator Agreement as a license to make and sell "the rotary collator which is more fully described in applications for letters patents...." Further, Paragraph 1 of the Amendment confirms "that the term 'Rotary Collator' as used in the Rotary Collator Agreement means and at all times has meant all of Mestre's inventions (if any), designs and developments, embodied in the rotary col-

> WHEREAS, Thomas desires to acquire the exclusive right to manufacture, use, sell, lease and deal in the products covered by the claims of the Patents and Patent Applications relating to collating machines, improvements thereon and any Patents which may hereafter issue thereon in all countries of the world; and
> WHEREAS, one License Agreement, dated October 3, 1958, has heretofore been entered into between Mestre and Thomas Collator Industries, Inc. (Industries), a wholly owned subsidiary of Thomas, and two License Agreements, dated October 16, 1959 and September 1, 1962, respectively, have heretofore been entered into between Mestre and Thomas under certain of the Patent Applications, the three agreements covering inventions embodied in Rotary, Vertical and so-called A–10 collating machines, respectively, invented by Mestre, all of said three License Agreements being cancelled and superseded by this Agreement; and * * * *

Article I of the first draft Amendment provided in part:

### The License

> (a) Mestre hereby grants to Thomas, its successors and assigns the sole and exclusive right to manufacture, have manufactured by others, use, sell, lease and deal in all products utilizing any of the inventions embodied in the claims of the Patents and Patent Applications and utilizing any of the claims of the Patents and Patent Applications covering any modifications thereof and improvements thereon relating to collating machines (sometimes collectively referred to as the Licensed Products) throughout the world, at royalty rates provided by Article III hereof.

14. 4. Paragraph 1 of the Rotary Collator Agreement is hereby amended to read as follows:

lating machine as described in applications for letters patent ... and embodied in the prototype of the machine which was delivered to Industries...." The second Whereas clause refers to the other three agreements and places similar reliance on the patents to describe the machines. Paragraph(s) 4. and 5. of the Amendment amend the license provisions of the agreement by granting the sole and exclusive right and license to make and sell the machine, "parts thereof and attachments thereto, *and under letters patent*, if any, which may *hereafter* issue on the inventions embodied therein." [14] (emphasis added)

The Term section of the Rotary Collator Agreement was amended by ¶ 11(a) of the

> "1. Mestre hereby grants to Industries, its successors and assigns, the sole and exclusive right and license to make, manufacture, have made or manufactured, use, import, export, sell and deal in the United States of America, its territories and possessions, and in foreign countries throughout the world, the Rotary Collator, parts thereof and attachments thereto, and under letters patent, if any, which may hereafter issue on the inventions embodied therein. Mestre further agrees that he will grant to Industries, its successors and assigns, the sole and exclusive right and license to make, manufacture, have made or manufactured, use, import, export, sell and deal in, within the United States of America, its territories and possessions and in foreign countries throughout the world any improvements in or modifications of the Rotary Collator, parts thereof and attachments thereto which Mestre may make (but he shall not be obligated to make any such improvements or modifications) after the date of this agreement and under any letters patent which may hereafter issue on the inventions embodied therein and which are uniquely suited or adapted for the Rotary Collator, parts thereof or attachments thereto, it being distinctly understood, however, that Mestre will not grant any rights to any new machine, parts thereof or attachments thereto which do not involve (i) patents applications for which are pending as stated herein (ii) patents on features which are uniquely suited or adapted for the Rotary Collator, parts thereof and attachments thereto or (iii) any improvements or changes which are uniquely suited or adapted for the Rotary Collator, parts thereof and attachments thereto."

Amendment. It is noteworthy that ¶ 14 of the Amendment, which alters the royalty provisions of the Rotary Collator Agreement, removes the $975,000 "ceiling" on royalty payments. The changes in ¶¶ 11(a) and 14 of the Amendment thus establish a term which is dependent on the passage of time rather than on the payment of an agreed-upon sum of money.[15] Another Amendment (¶ 11(b)) to the Term section of the Rotary Collator Agreement adds a new ¶ (e)[16] to that section, which provides that if the agreement is "terminated" by Thomas for any reason other than those contained in ¶ ¶ 2(a)&(b) of the Rotary Collator Agreement, Thomas would lose the right to make and sell rotary collators. (Mestre contends that the word "terminate" encompasses the term "expire" and that when the agreement expires ¶ (e) creates a reversion in Mestre of the rights to the rotary collator. Pitney-Bowes argues that "terminate" and "expire" are distinct, exclusive terms.) The Amendment at ¶ 18 uses both expiration and termination in the same paragraph and arguably draws a distinction between the two terms.[17]

## APPLICABLE LAW

The principle issues to be decided, with respect to all four amended agreements, are what are the expiration dates of the agreements and what are the post-expiration consequences. The latter issue can be restated as whether, after expiration of the term of an agreement, Pitney-Bowes is free to make and market the machine covered by the agreement without further royalty obligation to Mestre.

■ With reference to the question of royalty obligations, if the agreements are solely patent licenses, *Brulotte v. Thys Co.*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964) would appear to control. The Supreme Court held in *Brulotte* that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se.*" *Id.* at 32, 85 S.Ct. at 179. *Brulotte* thus stands for the proposition that patents are in the federal domain, and whatever the legal device employed, "a projection of the patent monopoly after the patent expires is not enforceable." *Id.* at 32, 85 S.Ct. at 179. Therefore, in the case of patent licenses, the law appears settled that royalty obligations created by license may not be used to extend the term of patent monopoly.

■ If the agreements are solely trade secret or know-how agreements, then the state law of contract governs.[17a] In *Aron-*

15. "11(a). The first three lines of paragraph 2 of the Rotary Collator Agreement are hereby amended to read as follows:
'The license hereby granted shall continue in full force and effect for seventeen (17) years, or for the term of any patent or patents which now or hereafter may issue on the Rotary Collator, parts thereof and attachments thereto, owned or developed by Mestre for which Industries has exclusive rights under this Agreement, whichever is greater, unless sooner terminated by notice as follows:' "

16. "11(b). Said paragraph 2 shall be further amended by the addition of a paragraph (e) to read as follows:
'(e) In the event of termination of this agreement other than as set forth in (a) and (b) above, Industries agrees that it will not, directly or indirectly, manufacture, use, sell or lease the Rotary Collator and the parts thereof or attachments thereto or otherwise exercise any rights granted to it by Mestre under the terms of this agreement, except that in any case Industries shall expressly have the right to continue to manufacture and sell parts and supplies to users of the Rotary Collator and to retain and maintain Industries' tools, jigs and dies for such purpose, provided, however, that in such event Industries shall pay to Mestre the royalties herein provided for such manufacture and sale of such parts and supplies.' "

17. The last sentence of paragraph 18 of the Amendment provides:
"Industries agrees that the expiration of this agreement, or its termination pursuant to the terms hereof, shall not in any way affect the operation of the two preceding paragraphs of this paragraph 6(a) or discharge Industries from the obligations, admissions or estoppels contained herein."

17a. Under the terms of the Amendment Agreement, "the Laws of the State of New York" govern any questions concerning the interpretation and enforcement of the agreements. *See* ¶ 29, Amendment Agreement.

*son v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979), Chief Justice Burger addressed the question of "whether federal patent law preempts state contract law so as to preclude enforcement of a contract to pay royalties to a patent applicant, on sales of articles embodying the putative invention, for as long as the contracting party sells them, if a patent is not granted." *Id.* at 258, 99 S.Ct. at 1097. The Court held that payment of royalties for trade secrets is not inconsistent with federal patent law, particularly where trade secrets allowed a manufacturer to be first in the market. In *Aronson* the language of the contract placed no condition on the issuance of a patent, and both parties were aware that a patent might not be granted. From these facts the Court concluded that the manufacturer placed significant value on exploiting the basic novelty of the device, even if no patent issued. The Court went on to hold that, even though the device that was the subject of the contract is no longer secret, when the contract was negotiated at arm's length, the novelty was enough to induce the manufacturer to agree to pay for the opportunity to be the first in the market, and patent law will not be a barrier to such an agreement.

If the agreements are some form of hybrid, granting exclusive rights both to trade secrets and know-how and to claims of patents, the law is not so clear, and the validity of such an agreement must be questioned. In *Kewanee Oil Company v. Bicron Corporation*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), Chief Justice Burger conducted "an examination of the interaction of these systems of protection of intellectual property—one established by the Congress and the other by a state—to determine whether and under what circumstances the latter might constitute 'too great an encroachment on the federal patent system to be tolerated.' " *Id.* at 482, 94 S.Ct. at 1886. Chief Justice Burger said:

> If a State, through a system of protection, were to cause a substantial risk that holders of patentable inventions would not seek patents, but rather would rely on the state protection, we would be compelled to hold that such a system could not constitutionally continue to exist. In the case of trade secret law no reasonable risk of deterrence from patent application by those who can reasonably expect to be granted patents exists.

*Id.* at 489, 94 S.Ct. at 1890.

The Court's analysis recognized the differences in the scope of protection as well as the differences in the nature of the intellectual properties protected under trade secret law and patent law, and concluded:

> ... that the extension of trade secret protection to clearly patentable inventions does not conflict with the patent policy of disclosure. Perhaps because trade secret law does not produce any positive effects in the area of clearly patentable inventions, as opposed to the beneficial effects resulting from trade secret protection in the areas of the doubtfully patentable and the clearly unpatentable inventions, it has been suggested that partial pre-emption may be appropriate, and that courts should refuse to apply trade secret protection to inventions which the holder should have patented, and which would have been, thereby, disclosed. However, since there is no real possibility that trade secret law will conflict with the federal policy favoring disclosure of clearly patentable inventions partial pre-emption is inappropriate.

*Id.* at 492, 94 S.Ct. at 1891.

The Court's conclusion evolved after a review of the purposes of the federal patent system: (a) patent law seeks to foster and reward invention; (b) patent law promotes disclosure of inventions, to stimulate further innovation and to permit the public to practice the invention once the patent expires; and (c) patent law with its stringent requirements for patent protection seeks to assure that ideas in the public domain remain there for the free use of the public.

In light of the rationales of *Aronson* and *Kewanee* and the purposes of the federal patent system, it appears that trade secret protection and patent protection (to the extent that their provisions are not

contradictory) may coexist in the same agreement. In the event that trade secret protection and patent protection overlap, patent law would preempt trade secret law. However, where the natures of the intellectual properties are different and the protection conferred under trade secret law does not impinge upon the protection under patent law, trade secret law does not constitute "too great an encroachment on the federal patent system to be tolerated." *Kewanee Oil Company, supra* at 482, 94 S.Ct. at 1886.

Insofar as the four agreements in issue here are concerned, the Court perceives two areas in which trade secret and patent protection may conflict: (a) the time of expiration of the terms of the agreements, and (b) the rights of the parties after the agreements expire. Mestre contends that each of the agreements represent a grant of trade secrets and know-how and a sale of patents,[18] that the trade secrets and know-how are completely separate and distinct from patents, and that the trade secrets and know-how continue to be protected by state law and have a legal viability separate and distinct from federal patent law. The simple answer to Mestre's contention is that to the extent that the trade secret/know-how protection covers separate and distinct intellectual property which coverage does not encroach on the federal patent system, this protection is controlled by state law and not federal patent law. In other words, there may be instances in which, given a hybrid trade secret and patent agreement providing clearly separate forms of protection, the trade secret protection might have a separate legal viability and might survive the expiration of a patent.[19]

Pitney-Bowes has conceded for the purposes of the Cross-Motions for Summary Judgment that "machine prototypes and shop experimental drawings provided by Mestre to Thomas Collators pursuant to each machine agreement embodied trade secrets at the time of initial disclosure."[20] Pitney-Bowes contends, however, that, as a matter of law, the machine agreements became patent licenses, subject to federal patent policy, when patents issued on the licensed machines. Underpinning Pitney-Bowes' contention is the argument that (a) Mestre applied for patents for each machine, prior to the execution of the agreement; (b) each agreement mentioned patents and Thomas' desire to have exclusive rights to the machines; (c) the Amendment Agreement defined all four machines in terms of what was described in the patent applications and in terms of patents issued or to be issued; (d) as to each agreement, patents were issued on the machines; and (e) none of the agreements apportions royalties among patented and unpatented information.

None of the parties has cited, nor has the Court discovered, a case which holds that, as a matter of law, the issuance of a patent on a machine that is the subject of a trade secret agreement, and that is mentioned in descriptive terms by reference to its patent application, but the issuance of which patent is not a condition of the agreement, transforms the agreement into a patent license. Pitney-Bowes' reliance on *Brulotte v. Thys Co., supra*, to support its contention is misplaced, especially in view of Pitney-Bowes' concession as to the grant of trade secrets pursuant to the agreements.

**18.** Mestre's contention that the basis of each bargain was the grant of trade secrets and know-how has been made consistently throughout this litigation. His argument that the agreements also embodied the sale of patents first appeared in Defendant's Memorandum in Reply, Docket # 131.

**19.** The Court is not compelled to set out the outer limits of such an inquiry here. In passing, however, the Court notes that appropriate subjects of inquiry, which are by no means exhaustive, would likely focus on the differences, if any, in the types of intellectual property covered, or any provision for allocation of royalties, and/or whether the agreement itself clearly differentiates between the two types of protection. This inquiry would, of necessity, be fact-specific, but poses no more difficult an undertaking than is normally encountered in other complex commercial litigation.

**20.** Pitney-Bowes' Memorandum in Opposition to Mestre's Motion for Summary Judgment, Docket # 117, at 7.

■ Therefore, in view of the foregoing, the Court concludes that the agreements did not become solely patent licenses when patents issued on the subject machines. Further, in light of the conceded grant of trade secrets pursuant to agreement and the two-fold conclusion that patent law does not *per se* pre-empt trade secret law and that patent protection and trade secret protection can coexist in the same agreement, it follows that in order for the issuance of a patent to have any effect on these licenses, the grant of rights to protection by the patent in each case must have been a subject of the agreement, and a basis of the bargain.

## CONSTRUCTION OF THE ORIGINAL FOUR AGREEMENTS AND THE AMENDMENT

■ The Rotary Collator Agreement granted rights to the *inventions* embodied in the rotary collator. The license portion of the agreement made no reference to patents, nor to rights or interests in letters patent. At the time of the execution of the agreement no patents had issued on the rotary collator. The agreement did not provide for an expiration date, and therefore conceivably could have continued indefinitely pending payment of the maximum fixed royalty. The agreement provided for the delivery of machine prototypes, drawings and a parts list. The conclusion is inescapable that the original Rotary Collator Agreement was solely a trade secret, know-how license.

■ The Vertical Collator Agreement describes the machine by reference to the patent applications and grants exclusive rights to Thomas in the machine *and* under any letters patent which may later issue.[21] The agreement provided for the delivery of prototypes, drawings and a parts list. Additionally, Thomas expressly acknowledged the receipt of "know-how" from Mestre. Therefore, it is concluded that the Vertical Collator Agreement is a hybrid trade secret, patent license. The A–10 Collator Agreement and Auto-Sorter Agreement are similar to the Vertical Collator Agreement in their reliance on patents and trade secrets. Therefore, both the A–10 Collator Agreement and the Auto-Sorter Agreement are hybrid trade secret patent licenses.

■ The first draft of the Amendment Agreement[22] represents a classic example of a patent license agreement. The later draft and the final Amendment manifest the intention of Mestre, and the acquiescence by Pitney-Bowes, that the amended agreements be something more than patent licenses. The resulting language of the Amendment Agreement leads to the conclusion that, whatever else the agreement did, it did not change the nature or scope of the trade secret/patent protection established under the original four agreements. While there is language which would indicate some reliance on patents in the amendment to the Rotary Collator Agreement, such reliance is negated by the confirmation as to the continued meaning of the "Rotary Collator" stressed in the Amendment Agreement. *Therefore, the Rotary Collator Agreement, as amended, remains solely a trade secret, know-how agreement.*

The amendment did not disturb the hybrid nature of the Vertical Collator, A–10 Collator, and Auto-Sorter Agreements. The intention of the parties that the agreements be something more than patent licenses is evident in the language of the Amendment and in the fact that the provisions referring to prototypes, drawings and parts lists were not deleted from the earlier licenses. *Therefore, the amended Vertical Collator, A–10 Collator and Auto-Sorter Agreements are hybrid trade secret, patent licenses.*

## EXPIRATION OF AGREEMENTS

Since the Rotary Collator Agreement is a trade secret license, the determination of the term of the agreement is a question of state contract law, and the duration of the agreement (and the concomitant royalty ob-

---

**21.** *See* footnote 6, *supra.*

**22.** *See* footnote 13, *supra.*

ligation) may extend for any period freely undertaken by the parties. *See Aronson v. Quick Point Pencil Co., supra; Kewanee Oil Co. v. Bicron Corporation, supra.* The Court, however, is unable to discern the expiration date from the language of the amended agreement; nor can the intentions of the parties be inferred from the undisputed facts adduced.[23] Therefore, the determination of the term of the Rotary Collator Agreement is not appropriate for summary judgment.

■ The Vertical Collator Agreement provides for a term which extends past the expiration of the last-to-expire patent on the machine.[24] As noted previously, *see* n.19, *supra,* the Court is persuaded there may be instances in which an obligation to make royalty payments under a hybrid license, granting rights to trade secrets and patents, would survive the expiration of the underlying patents. The Vertical Collator Agreement, as discussed above, is a hybrid license. Despite this threshold determination, the Court nevertheless concludes that Pitney-Bowes' obligation to make royalty payments pursuant to the Vertical Collator Agreement, after expiration of the patents, is invalid. This is because there is no explicit language in the agreement differentiating between the two forms of protection underlying the royalty obligation and because there is no division or allocation of royalties vis-a-vis the two forms of protection underlying the royalty obligation. *See Veltman v. Norton Simon, Inc.,* 425 F.Supp. 774 (S.D.N.Y.1977). Absent such provisions, the agreement, on its face, would appear to run counter to the decision in *Brulotte v. Thys Co., supra,* and to violate its specific proscription of the "use of a royalty agreement that projects beyond the expiration date of the patent...." *Id.* 379 U.S. at 32, 85 S.Ct. at 179. Simply stated, the Court thus concludes that the extension of the obligation to make royalty payments, pursuant to the Vertical Collator Agreement, beyond the expiration of the underlying patents represents too great an encroachment on the federal patent system. Therefore, the term provision which extends the life of the agreement beyond the expiration date of the last-to-expire patent, and the attendant royalty obligation, are invalid, and the Vertical Collator Agreement is deemed to expire on October 17, 1978—the expiration date of the last-to-expire patent.

The A–10 Collator and Auto-Sorter Agreements provide for expiration dates which are consistent with patent law coverage. Their respective expiration dates are self-apparent from the face of the agreements as amended.

## POST–EXPIRATION CONSEQUENCES

Pitney-Bowes seeks a declaration that it may continue to manufacture and sell the subject machines *after* expiration of the agreements, without entering into further agreements with Mestre and without paying further royalties to Mestre. Mestre contends, however, that such a declaration would be at odds with the operative effect of ¶ 11(b) of the Amendment Agreement. As noted above, under the terms of the machine agreements, Pitney-Bowes is obligated to make royalty payments on the sale of the licensed machines during the life of the agreements. Upon expiration of that obligation, Mestre asserts, ¶ 11(b) bars Pit-

---

**23.** *See* footnote 15, *supra.* Mestre contends that the Amendment sets the expiration date at December 30, 1982 (which is seventeen (17) years from the date of execution of the Amendment). Pitney-Bowes argues that the purpose of the Amendment ¶ 11(a) was to make the term provisions consistent with the other agreements and that, therefore, the expiration date should be seventeen (17) years from the date of execution of the original Rotary Collator Agreement or the date of the last-to-expire patent, whichever is greater (i. e., June 14, 1977).

**24.** Article II(a) of the Vertical Collator Agreement set forth three alternative dates of expiration: the life of Mestre, seventeen (17) years or for the term of any patents issued on the Vertical Collator, whichever is greater. Mestre lived for more than the seventeen (17) year period and past the expiration of the last-to-expire patent on the Vertical Collator. Therefore, under the terms of the Agreement, Mestre's date of death controls.

ney-Bowes from manufacturing or selling the machines unless new agreements are executed.[25] For the reasons noted below, the Court disagrees with Mestre's construction of ¶ 11(b).

■ Preliminarily, the Court notes that irrespective of whether the agreements in question are solely trade secret licenses or hybrid trade secret/patent licenses, the determination of any post-expiration rights of the parties to the trade secrets is a matter of contract law left for agreement by the parties.[26] We thus initially focus upon the language in ¶ 11(b) of the Amendment Agreement that sets forth the consequences which follow "[i]n the event of termination of this agreement."[27] As indicated, if the agreement is terminated for other than the reasons set forth in ¶¶ 2(a) and (b) of the Rotary Collator Agreement, Pitney-Bowes loses the right to make and sell the licensed machines. Mestre contends that, as that term is used in ¶ 11(b), termination is not limited to "active" termination but, rather, it ·encompasses "passive" termination such as expiration. In short, Mestre would construe expiration to be a form of termination, with that latter term's attendant consequences.

■ Mestre's argument that the expiration is a form of termination loses its force, however, when viewed against the backdrop provided by ¶ 18 of the Amendment.[28] By agreeing in that paragraph "that the expiration of this agreement, or its termination pursuant to terms hereof, shall not in any way affect the operation [of preceding provisions]," it is apparent that the parties viewed the terms to possess distinct, if not mutually exclusive, meanings. Thus, whatever else the term "expiration" means, the Court concludes that, based upon a facial

reading of the Amendment, that word was not meant to be synonymous with "termination" as used in ¶ 11(b). In view of this conclusion, "expiration" of the agreements, without more, would be insufficient to raise the bar contained in ¶ 11(b) against Pitney-Bowes' making or selling the licensed machines.

Given the Court's conclusion that ¶ 11(b), on its face, does not bar Pitney-Bowes from making or selling the licensed machines upon expiration of the machine agreements, the sole remaining issue is whether Mestre has some reversionary interest in the trade secrets which would bar Pitney-Bowes from making or selling the machines, upon expiration of the agreements, without payment of royalties. Mestre has directed the Court's attention to no other provision, and the Court's careful review of the agreements reveals no other provision which would create a reversionary interest in the trade secrets. The inquiry does not, however, stop there. We must, as a final matter, determine whether New York's body of trade secret law would imply a reversionary interest in the trade secrets to Mestre.[29]

■ Where, as here, a licensee such as Pitney-Bowes acquires trade secrets through a confidential disclosure, there is ample New York caselaw supporting the proposition that the licensee may not use or misappropriate that information after expiration of the license without making some form of compensation to the licensor. *See, e. g., Ewen v. Gerofsky*, 86 Misc.2d 913, 918, 382 N.Y.S.2d 651, 655 (1976), *aff'd* 72 A.D.2d 976, 422 N.Y.S.2d 273. Compensation may be compelled under one of two theories. A contractual obligation will be "implied in fact" when the evidence shows that the parties clearly intended payment to

**25.** ¶ 11(b), by its express terms, only applies to the Rotary Collator. However, ¶ 12 of the Amendment Agreement makes ¶ 11(b) equally applicable to the three other machines.

**26.** None of the parties has asserted any post-expiration rights to protection under the patent system. Such an assertion would be fruitless, since it is well settled that upon expiration of a patent, the intellectual property covered there-

by enters the public domain. *See Lear, Incorporated v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969); *Brulotte v. Thys Co.*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964).

**27.** *See* footnote 16, *supra.*

**28.** *See* footnote 17, *supra.*

**29.** *See* footnote 17a, *supra.*

the extent of use of the licensor's trade secrets, even though they did not set forth that intention in express language. Although this theory may eventually be found to be applicable, there is a material factual dispute here concerning the parties' mutual intentions with respect to Pitney-Bowes obligation, if any, to make royalty payments after expiration of the machine agreements. The Court, therefore, concludes that summary judgment implying such an obligation is inappropriate.

Alternatively, an obligation may be "implied in law" when there is no express obligation, but the circumstances make it inequitable for the licensee to profit from the continuing use of the licensor's trade secrets. Here again the Court is compelled to conclude that, based upon the record now before us, there are material factual questions concerning whether Pitney-Bowes will be unjustly enriched and, if so, to what extent, by its continued use of Mestre's trade secrets. Moreover, the Court perceives certain equitable considerations such as Mestre's purported tax treatment of income received under the machine agreements, which would militate against implying an obligation upon Pitney-Bowes to compensate Mestre under a theory of unjust enrichment. In its present state, the record will simply not permit the Court to weigh these equities at this juncture. Summary judgment on this latter theory is, therefore, similarly inappropriate.

## CONCLUSION

In conclusion, the Court finds that, with the exception of the parties' intent concerning the term of the Rotary Collator Agreement and certain post-expiration consequences under the four collator machine agreements as amended, there is no material factual dispute over the matters dis-

cussed above and summary judgment is, therefore, appropriate. Accordingly, pursuant to 28 U.S.C. §§ 2201, 2202, the rights and obligations of the parties are declared to be as follows:

1. With respect to the Vertical Collator Agreement, the A–10 Collator Agreement and the Auto-Sorter Agreement, which are hybrid trade secret/patent agreements, each expires on the expiration date of the last-to-expire patent licensed under that agreement. Moreover, nothing contained in those agreements or in the Amendment Agreement, specifically ¶ 11(b), bars Pitney-Bowes from making or selling the machine that is the subject of the agreement after expiration of said agreement. However, whether New York state law would imply a reversionary interest in the trade secrets underlying the agreements to Mestre and would impose a concomitant obligation upon Pitney-Bowes to compensate Mestre for the use of those trade secrets after expiration of the agreements, is an issue reserved for trial.[30]

2. With respect to the Rotary Collator Agreement as amended, which is solely a trade secret/know-how agreement, it expires upon the mutually agreed upon date as defined by New York state law. What that date is will remain for trial. Nothing contained in the Rotary Collator Agreement or in the Amendment Agreement, specifically ¶ 11(b), bars Pitney-Bowes from making or selling the Rotary Collator after expiration of that agreement, whatever that date is determined to be. However, whether New York state law would imply a reversionary interest in the trade secrets underlying that agreement to Mestre and would impose a concomitant obligation upon Pitney-Bowes to compensate Mestre for the use of those trade secrets after expiration

---

30. While intimating no view on the merits of the argument, the Court notes that, inasmuch as the Vertical, A–10 and Auto-Sorter Collator Agreements are hybrid trade secret/patent licenses, it can be argued that policies underlying federal patent law would be at odds with the operation here of any state trade secret law which required Pitney-Bowes to make royalty payments on machines sold after expiration of the agreements. Since the parties have not briefed this issue, the Court is simply unprepared, at this juncture, to consider it. However, if either or both parties are inclined to submit renewed motions for summary judgment pertaining to this issue, the Court would entertain them.

of the Rotary Collator Agreement, is an issue reserved for trial.[31]

In view of the foregoing discussion, it is

ORDERED AND ADJUDGED that Mestre's Motion for Summary Judgment is DENIED in its entirety. Pitney-Bowes' Motion for Summary Judgment is DENIED in part and GRANTED in part as set forth above.

---

31. Of course, if either or both parties conclude that the record, as supplemented by affidavits, could be sufficiently developed to dispose of material factual controversies pertaining to the Amended Rotary Collator Agreement, the Court would not preclude a renewed motion for summary judgment on either of the issues left open for trial by today's order.