**PITNEY BOWES, INC., Plaintiff-Appellant, Cross-Appellee,**

v.

**Celina MESTRE, Personal Representative of The Estate of Luis Mestre, deceased, Defendant-Appellee, Cross-Appellant.**

No. 81–5749.

United States Court of Appeals, Eleventh Circuit.

April 4, 1983.

Rehearing and Rehearing En Banc Denied May 17, 1983.

William J. Dunaj, Miami, Fla., Lars I. Kulleseid, Jesse J. Jenner, Frank L. Politano, Fish & Neave, New York City, King & Spalding, John C. Staton, Jr., Atlanta, Ga., William D. Soltow, Jr., Stamford, Conn., for plaintiff-appellant, cross-appellee.

Robert L. Shevin, Jerome H. Shevin, Jeffrey M. Weissman, Miami, Fla., for defendant-appellee, cross-appellant.

Before RONEY and JOHNSON, Circuit Judges, and DYER, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Pitney Bowes, Inc. brought this action under 28 U.S.C.A. §§ 2201, 2202, seeking a declaration as to its rights and obligations under royalty agreements entered into with Luis Mestre,[1] an inventor of paper collating machines. In its complaint, Pitney Bowes also sought an injunction against Mestre to prevent him from seeking arbitration under the agreements. The district court granted the injunction. *Pitney Bowes, Inc. v. Mestre*, 203 U.S.P.Q. 554 (S.D.Fla.1978). Following discovery, Mestre moved for summary judgment; Pitney Bowes responded with a cross-motion for summary judgment. The district court denied Mestre's motion and granted Pitney Bowes' motion in part. *Pitney-Bowes, Inc. v. Mestre*, 517 F.Supp. 52 (S.D.Fla.1981).[2] Both Pitney Bowes and Mestre appeal.

## I.

The subject of this appeal concerns five agreements entered into on the following dates:

(1) Rotary Collator Agreement—October 3, 1958;

(2) Vertical Collator Agreement—October 16, 1959;

(3) A–10 Collator Agreement—September 1, 1962;

(4) Auto-Sorter Agreement—December 30, 1965; and

---

1. Luis Mestre died during the pendency of this litigation. His wife, Celina Mestre, was substituted as a personal representative of his estate. For convenience, all references in this opinion to Mestre are in the masculine.

2. Although the opinion below spells "Pitney Bowes" with a hyphen, we follow the style as it appears on the district court's docket sheet and as Pitney Bowes referred to itself in its papers to the district court.

(5) Amendment to the Agreements—December 30, 1965.[3]

As their names suggest, each of the first four agreements licensed the right to manufacture and sell a different paper handling machine. In exchange, Mestre received the right to royalties on each machine manufactured and sold. Mestre had applied for patents on the machines prior to the execution of each agreement, and in each case patents were granted sometime after each agreement went into effect. In its complaint filed in district court, Pitney Bowes contended that each agreement licensed both patent rights and trade secrets[4] in the machines. Mestre disputed this as to the Rotary Collator Agreement, arguing that it licensed only trade secrets. In addition to this issue, the parties dispute: the expiration dates of the agreements; whether Mestre is entitled to payments from Pitney Bowes after the agreements expire; and the propriety of the district court's injunction against arbitration.

In its summary judgment opinion, in order to determine expiration dates, the district court analyzed each agreement separately. With regard to the Rotary Collator Agreement, the court agreed with Mestre that it licensed only trade secrets.[5] Accordingly, federal patent law did not apply and the question of expiration was solely a matter of state contract law. The agreement, as amended by the 1965 Amendment Agreement, provided for expiration after 17 years or after the last patent on the Rotary Collator expired, whichever was later. Because the court could not discern from the face of the agreement or the undisputed facts whether the 17-year period started in 1958, when the original agreement was signed, or in 1965, when the Amendment Agreement added the expiration provisions, the court

denied summary judgment as to the Rotary Collator Agreement and reserved the question of its expiration date for trial.

The 1959 Vertical Collator Agreement provided for expiration on the date of Mestre's death, on the date of the last patent to expire, or after 17 years, whichever was latest. The district court held that the Vertical Collator Agreement, unlike the Rotary Collator Agreement, licensed both patent rights and trade secrets. The Court then applied federal patent law to determine the expiration date of the agreement on the ground that the presence of patent rights in the agreement implicates federal law. Relying on the federal patent case of *Brulotte v. Thys Co.,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), in which the Supreme Court held unenforceable a royalty agreement providing for payments for patent rights after the patents expired, the district judge held that the Vertical Collator Agreement necessarily expired when the last patent on the Vertical Collator expired. The effect of this holding was to cut short the life of the agreement as written, because Mestre died after the last patent expired. The expiration date having been determined as a matter of law, no issue of fact remained for trial on the claim under the Vertical Collator Agreement.

The district court held that the A–10 Collator Agreement and the Auto-Sorter Agreement also licensed both patent rights and trade secrets and thus were hybrid agreements. These two agreements provided for expiration when the last patent expired or after 17 years, whichever was later. Because they licensed patent rights, federal patent law again was relevant to the determination of the expiration dates of the agreements. This time, however, the *Brulotte* case did not shorten the life of the

---

**3.** The agreements were entered into by Mestre and Thomas Collators Industries, Inc. Pitney Bowes acquired Thomas Collators Industries shortly after the 1965 Amendment Agreement and succeeded to the rights contained in the four prior agreements and the Amendment Agreement.

**4.** For purposes of this litigation, the district court treated trade secrets as interchangeable with know-how, 517 F.Supp. at 54 n. 1a, and we do the same.

**5.** *But see* note 13 *infra.*

agreements because the last patent on each machine expired after the 17-year periods expired. No questions of fact remained for trial as to either of these agreements and neither party questions the court's judgment as to them on appeal.

The final issue addressed in the district court's summary judgment opinion concerned the rights of the parties after the agreements expired. The court concluded that Pitney Bowes had a right to continue manufacturing and selling the machines after the agreements expired, but it also held that there remained a question of disputed fact as to whether, under state trade secret law, Mestre owned a reversionary right to ongoing payments from Pitney Bowes. Accordingly, the court denied summary judgment on the claim concerning Mestre's post-expiration rights, reserving it for trial.

Following the court's decision, Mestre moved for reconsideration of the denial of his summary judgment motion and moved to vacate the court's earlier order enjoining arbitration. Pitney Bowes also moved for reconsideration insofar as its summary judgment motion had been denied in part. On June 17, 1981, the district court denied all three motions, entered partial final judgment in accordance with its earlier summary judgment decision, and certified its judgment for appeal in accordance with Rule 54(b) of the Federal Rules of Civil Procedure.[6] Pitney Bowes then filed a notice of appeal, citing as reversible error the failure of the district court to grant summary judgment in its favor that 1) the Rotary Collator Agreement included a patent license and therefore was subject to federal patent law; and 2) after expiration of the agreements, Pitney Bowes is entitled to continue manufacturing and selling the collating machines without making payments to Mestre. Mestre also filed a notice of

appeal, citing as error, *inter alia,* the district court's summary judgment in favor of Pitney Bowes on the claim under the Vertical Collator Agreement. Mestre's notice does not specifically mention the district court's denial of his motion to dissolve the injunction against arbitration, but in his briefs to this Court he attempts to raise it as another issue on appeal.[7]

## II.

■ Although neither party raises the issue in its briefs, we find a substantial question as to whether we may entertain Pitney Bowes' appeal at this point in the litigation. Because the issues raised by Pitney Bowes—concerning the expiration date of the Rotary Collator Agreement and the post-expiration right of Mestre to trade secret payments—were not disposed of by final judgment below, we hold that we lack jurisdiction to consider them.

■ It is well established that the denial of a motion for summary judgment is not a final decision under 28 U.S.C.A. § 1291. A final decision is "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). An order denying summary judgment amounts to a decision that the claim remains pending for trial and is therefore interlocutory. *See, e.g., Jones v. St. Paul Fire & Marine Insurance Co.,* 108 F.2d 123, 125 (5th Cir.1939); 6 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.21[2] (2d ed. 1982).

■ A court presented with several claims may under Rule 54(b) of the Federal Rules of Civil Procedure direct the entry of final judgment as to fewer than all of the

---

**6.** The court denied a motion by Pitney Bowes to certify the judgment for appeal under 28 U.S.C.A. § 1292(b).

**7.** Following the court's June 17 order, Mestre suggested that the district court had failed to enter judgment as required under Rule 54(b).

The court entered partial final judgment on August 21, 1981. Both parties filed notices of appeal from the August order that were almost identical to the notices filed from the June order.

claims "upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." However, a certification of final judgment cannot for purposes of appeal render final a judgment which is interlocutory. The requirement of finality still applies, with the question of appealability turning on whether the entry of judgment completely disposes of one of the claims. *See, e.g., Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 435, 76 S.Ct. 895, 899–900, 100 L.Ed. 1297 (1956); *National Corn Growers Ass'n v. Bergland,* 611 F.2d 730, 732 (8th Cir.1980); *Spencer, White & Prentis, Inc. v. Pfizer, Inc.,* 498 F.2d 358, 362–63 (2d Cir. 1974); J. Moore & J. Wicker, *supra,* ¶ 56.-20[4]. An order only partially disposing of a single claim does not finally determine the claim and thus is interlocutory. *Id.; New Amsterdam Casualty Co. v. B.L. Jones & Co.,* 254 F.2d 917, 919 (5th Cir.1958).

In its summary judgment decision, the district court reserved for trial substantial questions of fact which precluded entry of final judgment on both claims that Pitney Bowes appeals. Concerning the claim under the Rotary Collator Agreement, the district court reserved for trial the factual question of whether the 17-year period specified in the expiration clause commenced in 1958 or 1965. Because the court did not dispose of the Rotary Collator Agreement claim by summary judgment, we cannot address the issues surrounding its expiration date until after trial and entry of final judgment. With regard to Pitney Bowes' claim concerning the post-expiration right of Mestre to trade secret payments, the court reserved for trial the question of whether, under state trade secret law, a post-expiration contract between Pit-

ney Bowes and Mestre can be implied. As with the claim under the Rotary Collator Agreement, we cannot address Pitney Bowes' contention regarding Mestre's post-expiration rights until the district court enters final judgment.

■ We do, however, have jurisdiction to decide Mestre's first contention on appeal. The district court's judgment that the Vertical Collator Agreement expired when the last patent on the Vertical Collator expired stands on a different footing than the rest of the summary judgment order. By determining that federal patent law conclusively established its duration, the court effectively ended the litigation as to the claim under the Vertical Collator Agreement.[8] Assuming that the Rule 54(b) certification was proper, the claim became appealable upon the entry of partial final judgment.

■ We are not bound by the district court's Rule 54(b) certification that the judgment on the Vertical Collator Agreement claim is final, *United States v. Crow, Pope and Land Enterprises, Inc.,* 474 F.2d 200, 202 (5th Cir.1973), but in Rule 54(b) cases, "the discretionary judgment of the District Court should be given substantial deference." *Curtiss-Wright Corp. v. General Electric Co.,* 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980). The district court justified its certification order with the finding that the unadjudicated claims are "practically and logically distinct" from the adjudicated claims as to the application of law and proof. We cannot say that the court's finding is "clearly unreasonable," *id.,* given the fact that the four agreements between Pitney Bowes and Mestre are independent of each other and that the claim to post-expiration rights raises entirely differ-

---

**8.** For purposes of Rule 54(b), we count the claim under the Rotary Collator Agreement as one claim among several claims raised by Pitney Bowes. Thus, this case meets the requirement of Rule 54(b) that the court finally determine at least one claim among multiple claims. *See Rieser v. Baltimore & Ohio RR Co.,* 224 F.2d 198, 199 (2d Cir.1955) (denial of motion to dismiss appeal) ("The ultimate determination

of multiplicity of claims must rest in every case on whether the underlying factual bases for recovery state a number of different claims which could have been separately enforced."), *aff'g district court on merits,* 228 F.2d 563 (2d Cir.1955), *cert. denied,* 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956), *quoted with approval in* 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2656, at 65 (1983).

ent considerations from the claims under the express agreements. The district court also found that:

> Judicial economy favors immediate review as to the adjudicated claims and the parties favor such review. At the very least, to attempt to try the issue of implied reversionary rights under circumstances wherein express contract rights have not been settled would maximize the likelihood of separate trials and be unduly expensive to all parties.

Neither party questions this finding. Accordingly, we hold that the requirements of Rule 54(b) have been met. The question of the duration of the Vertical Collator Agreement being properly before us, we turn next to a discussion of the merits of the district court's judgment on that issue.

### III.

■ The Vertical Collator Agreement, the second agreement negotiated by Thomas Collators Industries and Mestre, provided for the payment of royalties to Mestre in exchange for the "sole and exclusive right" to manufacture and market the Vertical Collator as described in then-pending patent applications.[9] As with the other agreements, although no patents had been issued on the Vertical Collator at the time the agreement was signed, patents subsequently were issued. The agreement contained

an acknowledgement of the importance of Mestre's know-how in the machine,[10] and another provision required Thomas Collators Industries and its assignees and sublicensees to keep secret all confidential information concerning the Vertical Collator.[11] Reciting these provisions, the district court agreed with Mestre and Pitney Bowes that the Vertical Collator Agreement licensed both patent rights and trade secrets and thus was a "hybrid" agreement.

As mentioned above, the Vertical Collator Agreement by its terms expired on the latest of three dates: the date of death of Mestre, after 17 years, or when the last patent on the machine expired. Mestre died April 6, 1980, the 17-year period expired October 16, 1976, and the last patent expired October 17, 1978—so by its terms the agreement should have expired April 6, 1980. However, Pitney Bowes, by letter of February 28, 1979, notified Mestre that in its view the Vertical Collator Agreement expired October 17, 1978. The district court, citing *Brulotte v. Thys Co.,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), agreed with Pitney Bowes.

In *Brulotte,* the owner of patents relating to hop-picking machines sold machines to farmers for a flat sum. With each sale the patent owner also issued a use license which required the payment of royalties for a period continuing after the patent expired.

---

**9.** Article I of the agreement contained the license:

> *The License*
>
> Mestre hereby grants to Thomas, its successors and assigns, the sole and exclusive right and license to make, manufacture, have made or manufactured by others, use, import, export, sell and deal in the Vertical Collator specifically described in said patent applications and any and all modifications thereof and improvements thereon that Mestre may hereafter make or develop and under any letters patent which may issue thereon and, subject to the obtaining of Mestre's prior written consent, to sublicense others to do so, within the United States of America, its territories and possessions, and in foreign countries throughout the world.

**10.** The second "whereas" clause provided:

> WHEREAS, Thomas has begun the manufacture and development for sale of the Vertical Collator solely by virtue of Mestre's disclosure to it of the principles thereof and his transfer to it of necessary manufacturing and technical "know-how" necessary for the commercial production thereof.

**11.** Article II(e) provided in pertinent part:

> No manufacturer shall be employed by Thomas, its assignees or sublicensees to manufacture the Vertical Collator, or such substantial components thereof as are likely to develop knowledge of the essential elements of the manufacture thereof, unless such manufacturer shall first agree in writing to keep secret all confidential information relating to the Vertical Collator, parts thereof or attachments thereto.

When the farmers refused to make payments, the patent owner sued. The farmers raised the defense of patent misuse insofar as the agreement extended beyond the expiration dates of the patents. Justice Douglas, writing for the Court, first reviewed the purposes of federal patent law and suggested that one purpose was to ensure that patented ideas enter the public domain upon the expiration of the 17-year period of protection accorded patent owners. At the end of the period, a "free market" was visualized in which the patent holder's monopoly influence would have "no proper place." *See* 379 U.S. at 30–33, 85 S.Ct. at 178–179. As to the hop-picking machine use licenses, two of their provisions suggested that the patent owner had improperly exerted his patent monopoly influence over the farmers. First, the license agreements prevented assignment or removal of the machines from their locations either before or after the patents expired. While such restrictions were "pertinent to protection of the patent monopoly," their continuation after the patents expired was "a telltale sign that the licensor was using the licenses to project its monopoly beyond the patent period." *Id.* at 32, 85 S.Ct. at 179. The second sign of patent misuse was that the royalties due after the patents expired were identical in amount to the royalties owed before expiration. After pointing out these facts, the Court concluded:

> The present licenses draw no line between the term of the patent and the post-expiration period. The same provisions as respects both use and royalties are applicable to each. The contracts are, therefore, on their face a bald attempt to exact the same terms and conditions for the period after the patents have expired as they do for the monopoly period. We are, therefore, unable to conjecture what the bargaining position of the parties might have been and what resultant arrangement might have emerged had the provision for post-expiration royalties been divorced from the patent and nowise subject to its leverage.

In light of those considerations, we conclude that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se.

*Id.* See also *Pipkin v. FMC Corp.*, 427 F.2d 353, 357 (5th Cir.1970).

Mestre contends that the district court should not have applied *Brulotte* and that *Brulotte* is distinguishable on the ground that the royalty payments in that case were solely for patent rights. The Vertical Collator Agreement, on the other hand, licensed both patent rights and trade secrets. In *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979) and *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), the Supreme Court held that trade secret agreements are protected by state law and are not subject to federal preemption by virtue of federal patent law. Focusing on the trade secret aspect of the Vertical Collator Agreement, Mestre argues that *Aronson* and *Kewanee* require us to enforce the agreement as written. Otherwise, we would deprive him of his contractual right to eighteen-months' worth of trade secret payments merely because he happened to apply for and obtain patents on the Vertical Collator.

We disagree with Mestre's interpretation of *Brulotte*. As we understand his argument, he contends that the holding in *Brulotte* should be limited to agreements licensing only patent rights; if state-protected non-patent rights such as trade secrets are also licensed, courts should enforce the agreement beyond the expiration of the patent on the ground that post-expiration payments are intended for the non-patent rights. Such an interpretation of *Brulotte* is faulty for two reasons.

First, it ignores the facts of *Brulotte*. The licenses in that case were for "use," which encompasses more than just patent rights. As the Court's opinion noted, *see* 379 U.S. at 32, 85 S.Ct. at 179, a use license could be issued for unpatented machines—

although it would be enforced under state rather than federal law. The *Brulotte* licenses therefore were, like the Vertical Collator Agreement before us, hybrid licenses for both patent and non-patent consideration. If Mestre's argument—that non-patent consideration in a licensing agreement renders *Brulotte* inapplicable—were correct, then the Court in *Brulotte* would have enforced the use licenses beyond the expiration of the patents. Instead, the Court cut off both the patent and non-patent royalties.

The contention that *Brulotte* does not apply to hybrid agreements is also refuted by dictum in *Aronson v. Quick Point Pencil Co., supra. Aronson* involved a royalty agreement covering both patent rights and trade secrets in a newly designed keyholder. At the time the agreement was entered into, the licensor had applied for, but not obtained, patents on the keyholder design. The agreement provided for a royalty of 5% of keyholder sales for as long as sales continued, but it also provided for a reduction of royalties to 2 and ½% if no patent issued within five years. No patent issued within that time and the manufacturer reduced his royalty payments accordingly. Nineteen years after the parties entered into the agreement, the manufacturer filed an action seeking a declaratory judgment that the agreement was unenforceable. The district court upheld the agreement as written. The court of appeals reversed, holding that the federal patent policy in favor of "the full and free use of ideas in the public domain" required that the manufacturer be relieved of its royalty obligations. Citing .*Brulotte,* the court of appeals observed that, had a patent issued on the keyholder design, the entire royalty obligation would

have ceased at the completion of the 17-year patent term, notwithstanding the terms of the agreement. *Quick Point Pencil Co. v. Aronson,* 567 F.2d 757, 762 (8th Cir.1977). The Supreme Court reversed the court of appeals, holding that federal patent law does not preempt state trade secret law where no patent issues. On this ground, it held that the agreement was enforceable as written. But the Court specifically noted the court of appeals' *Brulotte* conclusion, 440 U.S. at 261, 99 S.Ct. at 1098–1099, and at a later point in its opinion even agreed that, if a patent had issued, all royalty obligations would have ceased after 17 years. We find this significant because it clearly indicates that the Supreme Court is willing under certain circumstances to apply *Brulotte* to terminate royalty rights under a hybrid agreement licensing patent rights and trade secrets.

The second ground upon which we fault Mestre's interpretation of *Brulotte* is that it misstates the relationship between state trade secret law and federal patent law. While it is true that *Aronson* and *Kewanee* constitute support for enforcement of state trade secret law against possible claims of federal preemption, we do not believe that the Supreme Court necessarily intended full trade secret protection when patents actually issue. In *Kewanee,* no patent was ever applied for; in *Aronson,* the Court emphasized the fact that, although a patent was applied for, none was ever granted. When a patent issues, the potential exists for direct conflict between federal patent law and state trade secret law. When such a conflict occurs, the question is no longer one of federal preemption; it is instead one of federal supremacy.[12]

With these general considerations in mind, we turn to an analysis of the Vertical

---

12. This does not mean that parties cannot agree to license both trade secrets and patent rights on patents actually issued. As the Court in *Kewanee* noted, the purposes of patent protection and trade secret protection usually are entirely different, and the enforcement of trade secrets need not necessarily undermine federal patent policy. *See* 416 U.S. 479–93, 94 S.Ct. at 1885–1892. But if and when their purposes

conflict directly, federal supremacy requires that federal patent law determine the rights under the agreement.

Pitney Bowes does not contend that all hybrid agreements providing for post-patent-expiration payments necessarily raise a direct conflict with federal patent laws. Instead, it argues that the defect in the Vertical Collator Agreement is its failure to allocate payments

Collator Agreement. As in *Brulotte,* two provisions in the agreement suggest that the patentee used the leverage of his patent to project its monopoly beyond the 17-year patent period. First, the "exclusive rights" granted under the agreement applied equally before and after expiration of the patent. Like the assignment and removal restrictions on the hop-picking machines in *Brulotte,* the grant of exclusive rights is "pertinent to protection of the patent monopoly," but its "applicability to the post-expiration period is a telltale sign that the licensor was using the license to project its monopoly beyond the patent period." 379 U.S. at 32, 85 S.Ct. at 179. Second, the agreement required Pitney Bowes to pay royalties at the same rate and on the same basis after the patents expired that it paid while the patent was in effect. Assuming that the value of the agreement to Pitney Bowes was not as high after the patents expired, it is reasonable to assume that at least some

part of the post-expiration payment constituted an effort to extend payments for patent rights beyond the patent period. Thus, we conclude that the Vertical Collator Agreement is unenforceable under *Brulotte.*[13]

## IV.

■ The second issue raised in Mestre's appeal concerns the district court's injunction against arbitration. Pitney Bowes argues that we lack jurisdiction to consider this issue. In light of Mestre's failure to include any mention of the injunction in his notice of appeal, we agree.

Mestre could have appealed the injunction under 28 U.S.C.A. § 1292(a)(1) within thirty days of the date it was first entered in November 1978. *See* Fed.R.App.P. 4(a).[14] Pitney Bowes argues that, because Mestre failed to appeal then, he must now wait until the end of the litigation to appeal the

between trade secrets and patent rights. Citing *Veltman v. Norton Simon, Inc.,* 425 F.Supp. 774, 776 (S.D.N.Y.1977), it suggests that, had the parties to the agreement undertaken such an allocation, reduced payments for trade secrets after the patents expired might not have directly conflicted with federal patent law and therefore might have been permissible. The district court seems to have adopted this view. *See* 517 F.Supp. at 61 & n. 19, 63. *See also Modrey v. American Gage & Machine Co.,* 339 F.Supp. 1213, 1217–18 (S.D.N.Y.1972) (agreement providing for reduced royalties of 3% after patent expires does not violate *Brulotte* ). In light of our conclusion *infra* that the Vertical Collator Agreement violates federal patent law, and the fact that there is no allocation in the agreement, we need not decide whether allocation—or some similar provision—would have rendered it enforceable. Indeed, the Supreme Court has never addressed the question whether a hybrid agreement in which patents issue can ever survive the expiration of the patents. The court in *Brulotte,* however, applied a *per se* rule to agreements containing the same terms before and after the patent expires because it was "unable to conjecture what the bargaining position of the parties might have been" had no patent been involved. 379 U.S. at 32, 85 S.Ct. at 179. The implication of this language is that, if a patent owner can prove that he did not use his patent monopoly leverage to exact reduced post-expiration trade secret payments, then there would be no direct conflict with

federal law and the agreement would be enforced.

13. At oral argument, Mestre conceded that the Rotary Collator Agreement was a hybrid agreement licensing both patent rights and trade secrets—just like the other three licensing agreements. Despite our holding that we do not have jurisdiction to consider the appeal as to the Rotary Collator Agreement, the district court may choose to accept this concession; if so, *Brulotte* would apply to the Rotary Collator Agreement in the same manner as it does to the Vertical Collator Agreement. Thus, the Rotary Collator Agreement would expire on the date that the last patent on the Rotary Collator expired, and the question reserved for trial—namely, the starting date of the 17-year period identified in the amended expiration clause of the Rotary Collator Agreement—would be rendered moot.

14. Although the rule in the Second Circuit is that an order granting or denying an injunction against arbitration is not appealable under § 1292(a)(1), *see Greater Continental Corp. v. Schecter,* 422 F.2d 1100 (2d Cir.1970), the former Fifth Circuit chose to adopt the contrary rule of *A. & E. Plastik Pak Co. v. Monsanto Co.,* 396 F.2d 710 (9th Cir.1968) in *Petroleum Helicopters, Inc. v. Boeing-Vertol Co.,* 606 F.2d 114 (5th Cir.1979). *See also* 9 J. Moore, B. Ward & J. Lucas, 9 *Moore's Federal Practice* ¶ 110.-20[4.–1], at 248–49 (2d ed. 1982).

injunction. *Gloria Steamship Co. v. Smith,* 376 F.2d 46; 47 (5th Cir.1967), holds that an appealable interlocutory order may be appealed when first entered or when the final decree is entered, and Pitney Bowes relies on this case to support its argument that we should decline jurisdiction until the district court finally disposes of the case. *See also Caradelis v. Refineria Panama, S.A.,* 384 F.2d 589, 591 n. 1 (5th Cir.1967). But neither *Gloria Steamship* nor *Caradelis* involved interlocutory injunctions. Section 1292(a)(1) grants, in addition to a right of appeal from orders granting or refusing injunctions, a right of appeal from orders "refusing to dissolve or modify injunctions." [15] When Mestre moved for reconsideration of the district court's summary judgment decision, he also moved that the court remand the case to arbitration, thus effectively requesting that the injunction be dissolved. The district court's June 17, 1981, order denied both motions, so Section 1292(a)(1) provided Mestre with a second opportunity to appeal the order without having to await the final decree.

Pitney Bowes also points out that Mestre violated Rule 3(c) of the Federal Rules of Appellate Procedure by failing to state in his notice of appeal that he intended to appeal from the injunction order. This is, Pitney Bowes urges, an independent reason that we lack jurisdiction to review it. *See Cole v. Tuttle,* 540 F.2d 206 (5th Cir.1976); *Alabama Labor Council v. State of Alabama,* 453 F.2d 922 (5th Cir.1972).[16] Mes-

tre, on the other hand, contends that his intent to appeal the injunction was clear because he referred to the order which, among other things, denied the motion to dissolve the injunction. While it is true that the notice referred to that order, the notice specifically stated that the appeal was only "from those portions" of the order that dealt with issues raised in the summary judgment motions. In fact, the notice made that clear by specifically listing each issue on summary judgment; the injunction, which was not one of the issues dealt with on summary judgment, was not listed.

■ We cannot treat an omission of this nature as an excusable mistake. The former Fifth Circuit in *Kicklighter v. Nails by Jannee, Inc.,* 616 F.2d 734, 738 n. 1 (5th Cir.1980), stated that "it is well settled that an appeal is not lost if a mistake is made in designating the judgment appealed from where it is clear that the 'overriding intent was effectively to appeal.'" (quoting *United States v. Stromberg,* 227 F.2d 903, 904 (5th Cir.1955)). *See also Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962) (courts of appeal should not dismiss notices of appeal on grounds amounting to "mere technicalities"). But here we find no "overriding intent" to appeal the injunction. If anything, by specifically listing only the non-injunction issues, Mestre indicated his intent *not* to appeal the injunction. In *C.A. May Marine Supply Co. v. Brunswick Corp.,* 649 F.2d 1049 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct.

---

**15.** 28 U.S.C.A. § 1292(a)(1) grants courts of appeals jurisdiction from:

> Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court.

**16.** In addition, Pitney Bowes cites the fact that the court's Rule 54(b) certification did not mention the injunction. But in *Gray Line Motor Tours, Inc. v. City of New Orleans,* 498 F.2d

293 (5th Cir.1974), the court noted that it is unnecessary to

> obtain a certification under 54(b) if the order entered by the district court falls under section 1292(a)(1). Injunctive orders then are considered to be outside the scope of Rule 54(b). Wright and Miller, Federal Practice and Procedure, Vol. 10, § 2658. To hold otherwise would mean that the application of the Interlocutory Appeals Statute would be subject to the district judge's discretion to enter an order and certify and this we find would be contrary to the spirit of the statute. Wright and Miller, Federal Practice and Procedure, § 2962, p. 613.

*Id.* at 295 n. 1.

974, 71 L.Ed.2d 112 (1981), the court faced a similar situation and held that it did not have jurisdiction to decide the omitted portion of the judgment:

> Where the appellant notices the appeal of a specified judgment only or a part thereof, however, this court has no jurisdiction to review other judgments or issues which are not expressly referred to and which are not impliedly intended for appeal. See *Elfman Motors, Inc. v. Chrysler Corp.*, 567 F.2d 1252 (3d Cir. 1977); *Symons v. Mueller Co.*, 526 F.2d 13 (10th Cir.1975). In this situation, because the intent to appeal is not apparent, prejudice to the adverse party is likely to result if review is granted. Where parts of the judgment are truly independent, there is more likelihood that the designation of a particular part in the notice of appeal will be construed as an intent to leave the unmentioned portions undisturbed. *Terkildsen v. Waters*, 481 F.2d 201, 206 (2d Cir.1973); 9 *Moore's Federal Practice* ¶ 203.18 at 3–78 (2d Ed. 1980).

*Id.* at 1056. The situation before us is also analogous to that in *Cole v. Tuttle, supra,* in which a notice of appeal that specifically listed part of a final judgment, but not an earlier interlocutory order dismissing certain defendants, precluded the appellate court from considering the dismissal order.[17]

### V.

For the reasons set out above, we AFFIRM the district court's summary judgment in favor of Pitney Bowes as to the expiration date of the Vertical Collator Agreement. We DISMISS the appeal of Pitney Bowes as to the expiration date of the Rotary Collator Agreement and the post-expiration rights under all four agreements. We also hold that we are without

17. Although we do not reach the merits of the district court's order denying Mestre's motion to dissolve the injunction, our discussion of the role of federal patent law in determining the parties' rights amply supports the district court's conclusion that the claims "present issues too intertwined with federal law and poli-

jurisdiction to consider Mestre's arguments against the district court's injunction against arbitration.

cy to be arbitrable." *Pitney Bowes, Inc. v. Mestre,* 203 U.S.P.Q. 554 (S.D.Fla.1978). Moreover, still before the district court are substantial questions concerning the possible role of federal patent law in determining Mestre's right to post-expiration trade secret payments. *See* 517 F.Supp.. at 65 n. 30.