Robert **BOGGILD**, and William L. Dale, Plaintiffs,

v.

**KENNER PRODUCTS, DIVISION OF GENERAL MILLS FUND GROUP, INC., Defendant.**

No. C–1–83–638.

United States District Court, S.D. Ohio, W.D.

Dec. 15, 1983.

William Singer, Cincinnati, Ohio, for plaintiffs.

Donald McG. Rose, Cincinnati, Ohio, for defendant.

OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

SPIEGEL, District Judge:

This matter came on for hearing on the plaintiffs' motion for partial judgment on the pleadings with respect to defendant's eighth affirmative offense and second counterclaim (doc. 8) and defendant's cross-motion for partial summary judgment on its second counterclaim, or in the alternative to suspend both motions so that discovery with respect to these motions can be conducted (doc. 9). Defendant filed a memorandum in opposition to plaintiffs' motion and in support of its own motion (doc. 10) and a reply memorandum (doc. 15). Plaintiffs filed a reply memorandum in support of their motion and opposing defendant's motion (doc. 14).

Defendant's alternative motion to suspend both motions is denied as we find that additional discovery is not necessary to decide the issues presented to us by the cross-motions. We find that there are no genuine issues of material fact with respect to defendant's second counterclaim and eighth affirmative defense and further that plaintiff is entitled to judgment as a matter of law on that counterclaim and defense. Accordingly, defendant's motion is denied. Plaintiffs' motion is granted.

Underlying this action is a toy extruder device invented by plaintiffs. That device is the subject of an agreement and its amendments under which plaintiffs granted exclusive rights to the invention to Kutol Products, Inc. (*see* complaint, exh. A). Kutol, Kenner's predecessor in interest,

subsequently assigned its rights and obligations under the agreement to defendant Kenner.

The parties entered into the licensing agreement January 18, 1963.[1] Plaintiff subsequently applied for mechanical and design patents on their invention as required by Article II of the agreement. Both patents issued. The design patent expired March 2, 1979; the mechanical patent, August 9, 1983.

Plaintiffs brought this action challenging the way in which defendant has calculated royalties and alleging unauthorized use without payment of royalties. They seek an accounting and damages.

Defendant filed an answer in which it asserted two counterclaims, the second of which is the subject of these motions. That counterclaim seeks a declaration that as of August 9, 1983, when the second patent expired, defendant owed no further obligation to pay royalties to plaintiffs under the licensing agreement and may manufacture, use and sell the device disclosed or claimed in the two patents disclosing the extruder device without obligation to plaintiffs. This counterclaim is the obverse of defendant's eighth affirmative defense, which asserts that the expiration of the patents covering the device bars plaintiffs from enforcing the licensing agreement.

Article IV of the agreement gives defendant the exclusive right to manufacture, use and sell the licensed extruder device. Article II requires that plaintiffs file patent applications covering the device. Article IV(g), however, states:

> It is agreed by the parties hereto that the royalty payments provided for herein shall be paid by Kutol regardless of whether or not the filing of the patent applications contemplated in Article II hereof results in the issuance of a patent or patents.

Article XIII(d) of the agreement provides:

> Unless previously terminated in accordance with the foregoing provisions of this Article XIII, this Agreement and the rights granted hereunder shall run to the full end of the term or terms of any Letters Patent that may issue on or as a result of the application or applications referred to Article II hereof or for a period of 25 years, whichever is longer, and shall thereupon terminate.

As noted, the last of the applicable patents expired August 9, 1983. The twenty-five year period from the date of the license agreement will not expire until January 18, 1988.

The unambiguous language of the agreement makes it clear that the parties intended that royalty payments would continue whether or not the patents issued. Further, the payments would continue for a minimum of twenty-five years.

It is also undisputed that the inventors had not yet applied for patents covering the extruder device at the time the agreement was entered into. The agreement thus involved the disclosure and licensing by Boggild and Dale to Kutol of certain confidential information in the form of finished drawings of the design and a working model of the extrusion device.

Defendant's eighth affirmative defense and second counterclaim are grounded upon the proposition that the licensing agreement loses its validity and enforceability upon the expiration of the patents covering the licensed device. In effect, defendant argues that once the patents issued, plaintiffs lost the protection of state trade secret and/or contract law in exchange for the patent protection conferred by federal law. Defendant frames the issue raised by the cross-motions thusly:

> [W]hether a license agreement that expressly provides for the payment of royalties on the sales of defined subject matter for a term extending beyond the life of a patent which was contemplated

---

**1.** This agreement was subsequently modified by a 1966 agreement between plaintiffs and Rainbow Crafts, Inc., also a predecessor in interest of the present defendant, and by a 1971 agreement between plaintiffs and defendant Kenner Products Division. The 1963 agreement, however, is the only agreement pertinent to these cross-motions.

by the contract to cover the defined subject matter and which in fact does cover it is enforceable for the full term expressed by the agreement regardless of the expiration date of the patent, or whether the agreement becomes unenforceable as a matter of law upon the expiration of the patents.

(doc. 10 at 1–2). Defendant relies on *Brulotte v. Thys Co.*, 379 U.S. 29, 32, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964) in which the United States Supreme Court held that regardless of state contract law, a licensing agreement that extends a patent's monopoly beyond the life of the patent involved is a per se violation of federal patent law. Defendant concludes that the licensing agreement became violative of federal law and thus unenforceable as of August 9, 1983 when the latter patent expired.

█ It is fundamental that any attempt to continue "the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws." *Scott Paper Co. v. Marcalus Co.*, 326 U.S. 249, 256, 66 S.Ct. 101, 104, 90 L.Ed. 47 (1945) quoted in *Brulotte*, 379 U.S. at 31, 85 S.Ct. at 178. In *Brulotte* the Supreme Court held that royalty provisions of a licensing agreement covering the use of machines incorporating certain patents are not enforceable beyond the expiration of the last patent incorporated in the machine. The Court observed that a patentee may use his patent to exact the highest royalties possible, using his monopoly as leverage. 379 U.S. at 33, 85 S.Ct. at 179. However, it held unlawful per se a patentee's use of a royalty agreement extending beyond the date of the patent. 379 U.S. at 32, 85 S.Ct. at 179.

As plaintiffs point out, the facts of *Brulotte* are distinguishable. The royalty agreements in *Brulotte* issued in connection with the sale of machines incorporating seven patents, all of which had issued prior to the execution of the agreements, and licensed the use of the patent ideas. Thus the rights licensed were exclusively patent rights. In the present case, however, the agreement preceded the patents and thus the rights licensed are more properly characterized as trade secret rights— at least in part—and potential patent rights in part.

Defendant's response is that *Brulotte's* per se rule extends to agreements where a patent is applied for and issues after the agreement is negotiated. Defendant refers to *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983).

At issue in *Mestre* was a hybrid agreement licensing both patent rights and trade secret rights and providing for royalties in exchange for the sale and exclusive right to manufacture and sell a machine described in then pending patent applications. The agreement expired on the latest of three dates—the patentee's death, after seventeen years, or when the last patent on the machine expired. The last patent expired approximately eighteen months prior to the patentee's death. The Eleventh Circuit held that the agreement was unenforceable under *Brulotte* on the grounds that two provisions suggested that the patentee used the leverage of his patent to extend the monopoly beyond the seventeen year patent period. First, the exclusive rights licensed under the agreement applied equally before and after expiration of the patent and second, the agreement required the licensee to pay royalties at the same rate and on the same basis both before and after expiration of the patent. 701 F.2d at 1373.

█ In our view the Eleventh Circuit over extended the *Brulotte* rule. It is clear from that early case that the Supreme Court found that the agreement, on its face, revealed an improper leveraging of the patent monopoly. In *Brulotte*, the patents had issued; thus the patentee had something that he could leverage. Here, no application had been made. We recognize that, regardless of whether an application has been made, one might improperly leverage the possibility that a patent might issue if the parties believe there is a substantial likelihood that a patent might issue. Under those circumstances, however,

application of a per se rule is inappropriate. We hold, therefore, that the per se rule of *Brulotte* does not extend to the case where no patent application has been made at the time the agreement is negotiated even if an application is contemplated.

That, however, is not the end of our inquiry, for in this case patents did issue. We must, therefore, consider the proper relationship between federal patent law and state law in such a situation.

■ The test we must apply is whether state law which would otherwise render this agreement enforceable "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), quoted in *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262, 99 S.Ct. 1096, 1099, 59 L.Ed.2d 296 (1979). If state law does not present such an obstacle, then state law governs. Conversely, if state law otherwise rendering this agreement enforceable conflicts with federal law, then federal law governs.

■ As a preliminary matter, we note the clear distinction between the protection afforded by federal patent law and that available under state trade secret law. Under federal patent law, the inventor of a patentable "useful process, machine, manufacture, or composition of matter, or ... useful improvement thereof," 35 U.S.C. § 101, is granted an exclusive monopoly to sell or use his invention for seventeen years, at the end of which the invention will be disclosed to the public. 35 U.S.C. § 154; *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480–81, 94 S.Ct. 1879, 1885–86, 40 L.Ed.2d 315 (1974). Trade secrets, on the other hand, may or may not be patentable. The holder of a trade secret is protected against the disclosure or unauthorized use of the trade secret by those to whom it has been confided on condition that the secret not be disclosed. The holder is also protected against use of the trade secret where knowledge of the trade secret has been acquired by some improper means. O.R.C. § 1333.51; Restatement of Torts § 757(a). However, although the protection accorded a trade secret holder is for an indefinite period of time, the holder—unlike the patentee—runs the risk that his secret may be discovered through proper means such as independent invention or reverse engineering. In that event, the trade secret holder cannot prevent disclosure or use of his secret, unlike the patentee who can do so if his patent is not yet expired.

The Supreme Court has held that state trade secret law is not preempted by federal patent law. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). With respect to clearly patentable inventions, the Court found that extending trade secret protection to such inventions does not conflict with the patent policy of disclosure. *Id.* at 489–93, 94 S.Ct. at 1889–91.

*Kewanee*, however, was an action seeking relief from the misappropriation of trade secrets and was based upon employment agreements requiring the non-disclosure of confidential information or trade secrets obtained as. employees. The case thus did not present the issue of how royalty payments should be treated where licensed ideas were accorded the protection of federal patent law after the parties entered into a licensing agreement.

The Supreme Court subsequently held that state contract law is not preempted by federal patent law in an action to enforce a contract to pay royalties to a patent applicant on sales of goods involving the putative invention where the patent was not granted. *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979). While Mrs. Aronson's patent application was pending, Quick Point entered into a contract with her pursuant to which it would pay her five percent of the selling price in exchange for the exclusive right to make and sell the keyholder covered by her pending application. The contract further provided that if the patent did not issue within five years, Quick Point would pay a royalty of two and one-half percent of sales so long as Quick Point

continued to sell the keyholder. No patent issued.

Quick Point subsequently.brought an action to have the contract declared unenforceable on the ground that state contract law—which might otherwise make the contract enforceable—was preempted by federal law. The Supreme Court noted that at the time the contract was executed, the parties knew about the pending patent application and recognized the possibility that a patent might not issue. The Court observed that despite the uncertainty of patent protection, Quick Point obviously placed a significant value on being the first to exploit the basic novelty of the keyholder. *Id.* at 261–62, 99 S.Ct. at 1098–99.

On these facts, the Supreme Court found no conflict with any of the three goals of patent law: incentive to invention, disclosure, and the policy against withdrawing ideas from the public domain. The Court found that state contract law provided an additional incentive to invention and that encouraging inventors to arrange for the manufacture of their inventions furthered the federal policy of disclosing inventions. Finally, it found that enforcing a contractual obligation to pay royalties does not conflict with federal policy against withdrawing ideas from the public domain because enforcement would not withdraw the idea from the public domain. The Court reasoned that Mrs. Aronson's idea entered the public domain as a result of the agreement licensing the manufacture and sale of her invention. *Id.* at 262–63, 99 S.Ct. at 1099–1100. The Court maintained that its reasoning was consistent with that of *Brulotte* because on this record it was clear that although the pending application may have served Mrs. Aronson as leverage, that leverage was not abused as the reduced royalty provision revealed that both parties recognized a substantial likelihood that the patent would not issue. *Id.* at 264–65, 99 S.Ct. at 1100–01.

Defendant insists that *Aronson* is not applicable as no patent issued in that case and thus there could be no conflict between federal and state law. Further defendant maintains that the language of *Aronson* makes it clear that *Aronson* does not apply where a patent does issue. Defendant points out that its interpretation of the *Aronson* decision is consistent with the Eleventh Circuit's analysis of *Aronson* in *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983). Finally, it insists that a proper reading of Supreme Court cases leads inevitably to the conclusion that the Eleventh Circuit's reasoning in *Mestre* must be applied to the instant case.

As discussed earlier, *Mestre*, like *Aronson* and the instant case, involved a hybrid agreement. The Eleventh Circuit stated that in its view, and despite *Kewanee* and *Aronson*, the Supreme Court did not "necessarily" intend full trade secret protection where a patent issues subsequent to an agreement to pay royalties. It then stated:

> *When a patent issues, the potential exists for direct conflict between federal patent law and state .trade secret law.* When such a conflict occurs, the question is no longer one of federal preemption; it is instead one of federal supremacy.

*Id.* at 1372 (footnote omitted) (emphasis added). In other words, under the *Mestre* analysis, where a patent has issued, the Court must determine not whether federal law preempts but rather whether there is a conflict between federal and state law.

■ Because patents issued in this case, the question is not one of preemption, but rather of supremacy, as the Eleventh Circuit stated. However, in resolving a supremacy issue as in resolving a preemption issue, the fundamental question is whether there is a conflict. The Supreme Court's preemption discussions are thus critical to our own analysis.

■ The one principle that clearly emerges is that we must examine the agreement in light of the purposes of the federal patent law. Those purposes are well established: to foster and reward invention; to foster disclosure of inventions in order to stimulate further innovation and to permit the public to practice the inven-

tion following expiration of the patents; and to assure that ideas in the public domain remain there for the free use of the public. *Aronson,* 440 U.S. at 262, 99 S.Ct. at 1099, citing *Kewanee,* 416 U.S. at 480–81, 94 S.Ct. at 1885–86. We conclude that enforcing this agreement will not conflict with any one of these purposes.

First, the Supreme Court has already stated that permitting inventors to make enforceable licensing agreements in exchange for royalties provides an additional incentive to invention and thus is consistent with federal policy. *Aronson,* 440 U.S. at 262, 99 S.Ct. at 1099. We find that this incentive exists whether or not a patent issues. Secondly, the Supreme Court has stated that encouraging inventors to arrange for the manufacture of their inventions furthers the policy of disclosure because each manufactured item discloses the invention. *Aronson,* 440 U.S. at 262–63, 99 S.Ct. at 1099–1100. The situation is similar here; the effect of the agreement was to disclose the extruder device to the public. The agreement does not give the plaintiffs protection beyond that available to them under the patent law. As of the expiration of the last patent, any member of the public may manufacture, use, or sell the device. All the agreement requires is that the defendant continue to pay for the privilege of having been first in the market place. And third, enforcing a contract for royalties does not conflict with the policy against withdrawing ideas from the public domain. *Aronson,* 440 U.S. at 263, 99 S.Ct. at 1100. That policy is executed by issuing patents only to inventions that meet the exacting standards enacted by Congress. The agreement required the plaintiffs to seek the added protection of the patent law on behalf of the defendant. The effect of the patent was to withdraw the idea from the public domain for seventeen years. Now that the patents have expired the idea is in the public domain. All this agreement requires is that the defendant continue to pay royalties—as it agreed to do—for a period of time in exchange for the advantage of having been the first manufacturer of the device.

Even though there is no conflict with federal patent law, we are nonetheless left with the question posed by *Scott Paper* and *Brulotte:* whether the plaintiffs used the leverage of a patent to extract rights that would not otherwise be available to them and that went beyond the rights available to them under the federal patent law. *Scott Paper* prohibits the use of any legal device to extend the patent monopoly beyond the expiration of the patent. 326 U.S. at 256, 66 S.Ct. at 104. *Brulotte* forbids the use of a patent monopoly as leverage to project the patent monopoly beyond the term of the patent. 379 U.S. at 32, 85 S.Ct. at 179.

The answer to this question is located in the fact that the agreement at issue is one for the payment of royalties. Plaintiffs are not invoking the indeterminate protection of Ohio trade secret law. They are not seeking to prevent the public from manufacturing, selling or using this invention. Rather they seek to enforce the bargain they negotiated with defendant, *i.e.,* the payment of royalties for a specified period in exchange for defendant's having the advantage of being first in the market place. We also note that it was defendant—rather than plaintiffs—who primarily benefitted from the protection of the federal patent law. We conclude, therefore, that plaintiffs did not use this agreement to extend their patent monopoly beyond the terms of the patents. Moreover, we conclude that even if plaintiffs did use the possibility that their invention might be patentable as leverage, that leverage was not used to project the patent monopoly but rather to extract higher royalties. Accordingly, we find that this agreement does not fall within the prohibitions of *Scott Paper* and *Brulotte.*

We recognize that in *Aronson,* the Supreme Court concluded that Mrs. Aronson had not improperly leveraged her pending application because the agreement provided for lower royalties if the patent did not issue. 440 U.S. at 264–65, 99 S.Ct. at 1100–01. The parties in our case did not include

such a provision which could make such a conclusion inevitable. That language, however, is dicta. More important, nothing in *Aronson* suggests that an inventor may not use the possibility that his idea is patentable as leverage. What is prohibited is using that leverage to extend a patent monopoly. We read *Scott Paper, Brulotte,* and *Aronson,* as permitting an inventor to leverage the possibility that his invention is patentable for the purpose of extracting more advantageous royalty terms for a specified and reasonable period of time even if subsequent to the agreement a patent does issue but the patent expires before the negotiated period over which royalties are payable.

In the instant case, it is unnecessary to determine whether plaintiffs used the possibility that their invention was patentable as leverage. It is clear from the undisputed facts that even if that possibility was leveraged it was for the purpose of extracting higher royalties, not of unlawfully extending the patent monopoly.

To summarize, what the defendant negotiated for in this case was for the right to be first in the marketplace with a novel idea. The parties drafted an agreement which made it clear that the defendant was willing to pay for that right whether or not the patent issued. In the event the patent issued the defendant would have additional protections. We simply see no way in which this conflicts with any of the three stated and clearly recognized purposes of the federal patent law. We find that state law does not stand as "an obstacle to the accomplishment and execution of the sole purposes and objectives" of federal patent law. *Hines,* 312 U.S. at 67, 61 S.Ct. at 404.

We find further that the language of the agreement reveals that this agreement is not an attempt to extend a patent monopoly beyond the term of the patent. Moreover, we find that because plaintiffs did not seek to extend the patent monopoly beyond its term, whether they leveraged the possibility that their invention was patentable is not material. Accordingly, we conclude that this agreement for the payment of royalties is enforceable under state law.

As there are no disputed issues of material fact, we hold that plaintiffs are entitled to judgment as a matter of law on defendant's second counterclaim and defendant's eighth affirmative defense. Accordingly, judgment is hereby entered against defendant and for plaintiffs on defendant's second counterclaim.

SO ORDERED.